280 N.J. Super. 47 (1995)
654 A.2d 495
MARYANN PERANIO, PLAINTIFF-RESPONDENT,
v.
LAWRENCE PERANIO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 18, 1994.
Decided March 7, 1995.
*49 Before Judges LONG and ARNOLD M. STEIN.
James M. Cerra argued the cause for appellant.
Respondent, Maryann Peranio, argued the cause pro se.
The opinion of the court was delivered by LONG, J.A.D.
Plaintiff, Maryann Peranio and defendant, Lawrence Peranio were separated and in the process of obtaining a divorce, when, on January 27, 1994, plaintiff filed a Domestic Violence complaint against defendant. The complaint alleged that on January 26, 1994, defendant "forced entry" into plaintiff's home; "pushed" plaintiff and their child; stated, "I'll bury you," and used "extreme foul language." The complaint also alleged "verbal harassment and assaults for the past two years."
A hearing took place at which various matters were explored, including plaintiff's claim that on a single occasion over a year before defendant had pushed her into the refrigerator. Defendant denied this and the trial judge specifically found an "absence of any history of assaultive behavior on his part." Thus, the details of this testimony are unimportant.
*50 Plaintiff did testify that on January 26, when defendant came over to inspect water damage in the basement, he claimed that some of his personal property was missing and accused her of disposing of it. She stated:
At that point he just goes on about I'm selling marital items, I have no right to be doing this, and all I stated to him is, when you left I told you take what you want from here. At that time he took my daughter's hand, he's walking outside and he's telling me that him and I are beyond words, there's no more talking between us and that he'll bury me. And this is something that goes on non-stop.
....
Q. After you indicate he made this remark, I'll bury you, what did he then do?
A. He took the kids and he left.
Defendant moved to dismiss the complaint and plaintiff was allowed to make a statement in opposition. She said:
I don't want him to be allowed in ... my residence because it is my residence and that to me is like a safe haven. I don't want to sit here and keep going back and forth over the arguments and the fights that we've been having. I just feel they're uncalled for.
And the reason I went for this is [I] just tried to avoid all this. If we have no contact, the kids won't be involved in any of this.
Defendant testified that on January 26 when he went to inspect the water damage, he saw that his weight lifting machine was missing. According to his testimony, plaintiff said she got rid of it. He became angry and said:
A. I told her that I will bury you, you know, with all the stuff that you are doing illegally to me, getting rid of all personal assets, that you know I was going to take care of it in some way.
Q. Bury her, in what respect?
A. Not in the ground, just the Court will handle it.
Q. Well when you make this comment about burying her, what other discussion did you have about the personal property?
A. That she can't get rid of it.
Q. Did you threaten her?
A. No, no.
Q. When you make the comment that you would bury her, did you advance toward her?
A. No.
Q. Did you threaten her?
A. No.
Q. Did you push her?

*51 A. No.
Q. Did you come into contact with her in any way?
A. No, none at all.
Q. And after you made that comment, what if anything did she say to you?
A. As I was walking out with my daughter, she was on the front steps, she says I want you out of my f'n life, and I just kept on walking to my truck and left.
Q. And was there any further contact with your wife.
A. No, I left.
....
Q. Just so that we have a clear understanding of this brief discussion where you make the comment that you would bury your wife, I'd like you to indicate to the Court what your specific intention was when you made that statement to her? What message were you trying to give her?
A. The message I was giving her is that the more stuff you do illegal the Court will take care of it, what you're doing to me. I'm not going to bury you; the Court's going to bury you for everything you're doing to me.
Q. Was it with respect 
A. It's not intentional of bodily harm. It's just a phrase.
Q. Was it in connection with her removal of the materials?
A. Yes, it was. Yes, it was.
Q. Was it in connection with anything else?
A. No, no, it was just removing the stuff that was ours.
Q. Were you referring to the list of items that you had prepared?
A. Yeah.
Q. What was the context of that?
A. Of the list I had?
Q. Yeah.
A. It's all kinds of  collector's items. I have some of them now but I have posters, you know, Super Bowl tickets and certain things like that. I have antiques in the attic. I have Lionel trains. I have stuff that is still at the marital residence and I want them to stay there until this is over. I want half of what's mine.
I don't want her to get rid of them beforehand because these are stuff that my father gave me. The Lionel trains are for my son. Fine. But they're mine. I will give it to him at that time. It's not for her to get rid of.
The trial judge found:
The issue here obviously centers around the meaning of the phrase, "I'll bury you," as uttered by the defendant to the plaintiff on the afternoon of January 26th after he had been at the residence to inspect the damage and the repair to the piping, the damage due to the weather.
He observed certain items of personalty that he believes he's entitled to in equitable distribution to be missing and, as a result, became upset. Plaintiff indicates that he uttered the phrase, I'll bury you, just after indicating there will be *52 no further discussion with the plaintiff, and he then left the premises with the children. The plaintiff by her testimony indicates that she was upset. She describes herself as shaking given the conduct by the defendant in making this comment to her.
And this incident, I'm satisfied to find apparently has been indicative of the breakdown in the relationship between the parties through verbal arguments that have ensued since their separation. The defendant denies any intention to harm the plaintiff by uttering that phrase and he further denies having engaged in any assaultive conduct against his wife at any point in the past and indicates his intention not to engage in any alarming conduct.
I believe from an objective standard though in evaluating this matter the phrase, I'll bury you, has to be considered in terms of the fear that the plaintiff describes to herself by reason of the comment being made by the defendant to her. While the intention of the defendant in making that comment would be to obtain his rights under the law with regard to the divorce proceeding and if the plaintiff was engaging in conduct to divert assets that could not be equitably distributed, and he was upset with that and I can understand that upsetment.
That resulted though in him making this comment to the plaintiff. The plaintiff indicates though that she was upset and that upsetment is probably directly related to the history of verbal arguments engaged in by these parties over the past. It is in dispute though as to whether he ever pushed her against the refrigerator.
Clearly there is an absence of any history of any assaultive behavior on his part and I'm not satisfied he engaged in assaultive  terroristic threats, as that phrase is defined under Title 2C. But his comment about I'll bury you can be construed as alarming, certainly causing annoyance and alarm to the plaintiff in the context in which it was uttered and given the fact of the fear that she was experiencing by him making that comment.
So on that basis the Court will enter a Final Restraining Order barring him from engaging in further acts of domestic violence and barring him from returning to the scene as well as barring him from engaging in further acts of harassment and from having any contact with the plaintiff in person, in writing or through third parties.
Defendant appeals. We reverse.
Domestic violence is a term of art which defines a pattern of abusive and controlling behavior injurious to its victims. See, e.g., Marsha J. Kleinman, Family Violence: It can be a killer, 41 N.J. Psychologist (1991); Courtney N. Esposito, Abuse: Breaking the Cycle of Violence: The Victim's Perspective, 8 Trends in Health Care, Law and Ethics (Spring 1993), reprinted in Domestic Violence (New Jersey Institute of Continuing Legal Education 1993).
*53 The Prevention of Domestic Violence Act (repealed, L. 1991, c. 261 § 20, reenacting L. 1991, c. 261 § 1), N.J.S.A. 2C:25-17 to -33, was New Jersey's response to this problem. The findings which undergird the act are set forth at N.J.S.A. 2C:25-18 (emphasis added):
The Legislature finds and declares that domestic violence is a serious crimes against society; that there are thousands of person in this State who are regularly beaten, tortured and in some cases even killed by their spouses or cohabitants; that a significant number of women who are assaulted are pregnant; that victims of domestic violence come from all social and economic backgrounds and ethnic groups; that there is a positive correlation between spousal abuse and child abuse; and that children, even when they are not themselves physically assaulted, suffer deep and lasting emotional effects from exposure to domestic violence. It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.
The Legislature further finds and declares that even though many of the existing criminal statutes are applicable to acts of domestic violence, previous societal attitudes concerning domestic violence have affected the response of our law enforcement and judicial systems, resulting in these acts receiving different treatment from similar crimes when they occur in a domestic context. The Legislature finds that battered adults presently experience substantial difficulty in gaining access to protection from the judicial system, particularly due to that system's inability to generate a prompt response in an emergency situation.
It is the intent of the Legislature to stress that the primary duty of a law enforcement officer when responding to a domestic violence call is to enforce the laws allegedly violated and to protect the victim.... It is further intended that the official response to domestic violence shall communicate the attitude that violent behavior will not be excused or tolerated, and shall make clear the fact that the existing criminal laws and civil remedies created under this act will be enforced without regard to the fact that the violence grows out of a domestic situation.
These findings indicate that the focus of the Legislature was regular serious abuse between spouses. That this is so is underscored by the references to torture, battery, beatings, and killing in the findings. Likewise addressed was the long term damage suffered by children who observe such despicable acts. The way that the Legislature addressed these problems was to provide emergency and long-term protection to domestic violence victims whose complaints against their spouses had traditionally been treated cavalierly by law enforcement officers, solely because they arose in the domestic context. Among the domestic violence remedies provided are exclusion of defendant from the marital *54 premises, suspension of visitation, monetary relief to plaintiff and mandatory counseling. N.J.S.A. 2C:25-29.
In enacting the domestic violence law, the Legislature did not create a new class of offenses or interdict acts which otherwise were not addressed by the criminal law, but ensured that spouses who were subjected to criminal conduct had full access to the protections of the legal system. Instead of redefining classes of prohibited conduct, the domestic violence law simply incorporated the following criminal statutes:

 (1) Homicide N.J.S. 2C:11-1 et seq.
 (2) Assault N.J.S. 2C:12-1
 (3) Terroristic threats N.J.S. 2C:12-3
 (4) Kidnapping N.J.S. 2C:13-1
 (5) Criminal restraint N.J.S. 2C:13-2
 (6) False imprisonment N.J.S. 2C:13-3
 (7) Sexual assault N.J.S. 2C:14-2
 (8) Criminal sexual conduct N.J.S. 2C:14-3
 (9) Lewdness N.J.S. 2C:14-4
 (10) Criminal mischief N.J.S. 2C:17-3
 (11) Burglary N.J.S. 2C:18-2
 (12) Criminal trespass N.J.S. 2C:18-3
 (13) Harassment N.J.S. 2C:33-4

[N.J.S.A. 2C:25-19.]
However, it is clear that the drafters of the law did not intend that the commission of any one of these acts automatically would warrant the issuance of a domestic violence order. The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of violence between the parties including previous threats, harassment and physical abuse, and in light of whether immediate danger to person or property is present. N.J.S.A. 2C:25-29a(1) and (2). This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which plaintiff's claim that defendant committed domestic violence when he said "I'll bury you" must be evaluated.
*55 Harassment, which is the focus of this case, is defined in N.J.S.A. 2C:33-4 as follows:
Except as provided in subsection d., a person commits a petty disorderly persons offense if, with purpose to harass another, he:
a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.
A communication under subsection a. may be deemed to have been made either at the place where it originated or at the place where it was received.
d. A person commits a crime of the fourth degree if in committing an offense under this section, he acted, at least in part, with ill will, hatred or bias toward, and with a purpose to intimidate, an individual or group of individuals because of race, color, religion, sexual orientation or ethnicity.
The provision of the harassment statute relevant here is N.J.S.A. 2C:33-4(c). Integral to a finding of harassment under N.J.S.A. 2C:33-4(c) is the establishment of the purpose to harass, D.C. v. T.H., 269 N.J. Super. 458, 461-62, 635 A.2d 1002 (App.Div. 1994); E.K. v. G.K., 241 N.J. Super. 567, 570, 575 A.2d 883 (App.Div. 1990), along with a course of alarming conduct or repeated acts intended to alarm or seriously annoy another, Grant v. Wright, 222 N.J. Super. 191, 196, 536 A.2d 319 (App.Div.) certif. denied, 111 N.J. 562, 546 A.2d 493 (1988).
None of these elements is present in this case. First, there was no finding that defendant intended to harass plaintiff. The trial judge appears to have found that defendant did not make the statement "I'll bury you" for harassing purposes, but that it was nevertheless objectively alarming to plaintiff. This finding is insufficient as a matter of law to meet the statutory standard. Second, even if the judge had found a purpose on defendant's part to harass plaintiff, that purpose, standing alone, would not have satisfied the definition of harassment under N.J.S.A. 2C:33-4c unless it was manifested by a course or repeated acts of alarming conduct. See Grant v. Wright, supra, 222 N.J. Super. at 196, 536 A.2d 319 (defendant's surreptitious removal of plaintiff's belongings *56 from their apartment and one occasion of shouting and door slamming was held not to constitute a course of alarming conduct, regardless of defendant's purpose).
Separate and apart from these evidential insufficiencies which preclude a finding of the predicate act of harassment, defendant's conduct was plainly never contemplated by the Legislature as domestic violence. Here, there was absolutely no history of threats, harassment, physical or mental abuse or violence between parties, who were on the threshold of dissolving their marriage when a conflict over property occurred. What happened was that plaintiff and defendant, whose relationship the trial judge correctly characterized as broken down, had a disagreement. As a result, defendant said something to plaintiff in annoyance which upset and alarmed her. Why she was alarmed in light of the pacific history of the couple is hard to say. Although it can safely be observed that defendant's conduct was no model, application of the domestic violence law to it diminishes the suffering of true victims of domestic violence and misused the legislative vehicle which was developed to protect them. It also had a secondary negative effect: the potential for unfair advantage to a matrimonial litigant. As we said in Murray v. Murray, 267 N.J. Super. 406, 410, 631 A.2d 984 (App.Div. 1993):
We are concerned, too, with the serious policy implications of permitting allegations of this nature to be branded as domestic violence and used by either spouse to secure rulings on critical issues such as support, exclusion from marital residence and property disposition, particularly when aware that a matrimonial action is pending or about to begin.
While we are sympathetic with plaintiff's desire to shield her children from the bickering which took place between her and defendant during his visits (this was plainly one of the factors which fueled the filing of the domestic violence complaint), the fact of the matter is that the dissolution of a marriage is rarely a happy event. All parties suffer and even the most rational are hard pressed to avoid any emotional encounters. Our hope, like plaintiff's, is that all children of divorce can be spared arguments and recriminations. But this needs to come from the good intentions *57 of their parents and not from the misapplication of the domestic violence law, which law was intended to address matters of consequence, not ordinary domestic contretemps such as this.
Reversed.