694 A.2d 603

KATHLEEN CESARE, PLAINTIFF–RESPONDENT, v.
RICHARD CESARE, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued May 12, 1997—Decided June 19, 1997.

Before Judges PETRELLA, LANDAU and WALLACE.[1]

*Donald W. Stieh* argued the cause for appellant (*Stanton & Stieh,* attorneys; *Mr. Stieh,* of counsel, and on the brief).

*Paul D. Amitrani* argued the cause for respondent (*Bowers, Murphy, Lieberman, Amitrani & Lambo,* attorneys; *Mr. Amitrani,* on the brief).

PER CURIAM.

Defendant Richard Cesare appeals from the entry of a domestic violence order. He argues that the Family Part Judge erred as a matter of law in finding that he committed an act of domestic violence.

---

[1] Judge Wallace did not participate at the argument of the appeal, but has participated in the decision with the consent of the parties.

Kathleen Cesare, the plaintiff, and Richard Cesare, the defendant, had been married for thirteen years and had three children, ages 12, 10, and 6 at the time of the hearing. The plaintiff, a school teacher, testified that the couple had discussed ending their marriage for several years, and that she had left her husband, a landscaper, in August 1995, for a six-week separation after which they had reconciled.

Plaintiff testified that on the evening of July 9, 1996, she and defendant got into an argument because she wanted to end the marriage. During the argument, the pair discussed the custody of the children. Plaintiff testified that defendant said there was no way she would get custody of the children and that he was not going to sell the house and give her half of the proceeds. Plaintiff informed defendant that he might not have a choice if a court ordered it. She said: "I said to him that if we went through the system that, you know, I asked him, Do you think you'll have a choice?" Plaintiff said he responded: "As I've told you before, I do have a choice, and you will not get either of those things." She interpreted this statement as a threat because "[i]n the past he has told me that he will kill me before I get custody of our children and before he gives me any part of our assets." The argument lasted perhaps an hour and ended when defendant said he felt sick and went upstairs to bed. Plaintiff said her husband did not use any profane language during the exchange.

After he was upstairs for about five minutes, defendant started asking his wife to come upstairs. She said that he sounded agitated and angry, and shouted from the top of the stairs: "What are you still doing down there? Why don't you come up here?" At this time, two of the children were apparently sleeping upstairs in the house, with the third child at a friend's house. After persistent pleas by defendant for plaintiff to come upstairs, she said she responded: "Why, do you want to shoot me now?" In reaction, defendant apparently glared at her for perhaps five or ten seconds and then returned up the stairs. She said her fear was: "That he had gotten a gun out upstairs and that he wanted

me upstairs so he could use it." There were guns in the house. Fearful for her own safety, she thereafter put a jacket on over her pajamas and left the house and children to go to the police department. There, she signed a complaint under the Domestic Violence Act (Act). *N.J.S.A.* 2C:25–17 *et seq.*

According to plaintiff, during their marriage her husband had made a number of threats to kill her as follows:

> We have railroad tracks behind our house. He has told me he could, you know, make it look like I was taking a walk and somehow secure me to the railroad tracks until the train came. He has told me that he would put me in our shed, make it look like—tie me in our shed, make it look like some type of gas, propane explosion. He said that he can make it look like suicide.

In plaintiff's words, threats of this nature occurred:

> Over the course of the last maybe five years when our marriage would get very difficult and I would, you know, start to bring up the idea that maybe we would be better apart, it would end up in these threats, but probably only maybe, you know, it probably came to that point maybe once a year over the last five years.

Plaintiff testified that her husband never apologized for or retracted any of these threats and generally was very angry during these discussions.

As part of the history of the marital relationship, plaintiff also stated that:

> [E]arly in our marriage, he slapped me a couple of times, but it didn't turn into regular behavior. He, he would, when he was yelling at me would get me maybe against a wall, not, not even with his hands, but just with his entire body, you know, keep talking at me until I was backed up against the wall, or backed up. At one point I was completely over, bent backwards over a chair.

Plaintiff also described that a couple of years ago defendant:

> was hitting our son for some incident in the back yard, I don't remember what the actual incident was, and I was calling from the house for him to stop, and he, you know, he didn't listen. So I told him I was going in to call the police.

According to plaintiff, there were other disagreements and arguments between the parties. However, the only other time that she reported any incident to the police was in May 1996. Plaintiff did not pursue the matter or file any complaint at that time. Plaintiff acknowledged that they had attended marriage counseling and also that her husband was on medication for depression.

Henry A. Phillips, plaintiff's father, testified on behalf of his daughter that defendant told him that he did not intend to carry out his threats to take plaintiff's life but admitted making such statements. Defendant acknowledged that the couple had an argument on July 9, but denied ever threatening plaintiff with a gun, or previously threatening to tie her to railroad tracks or put her in a shed and kill her.

At the trial, on July 18, 1996, the judge considered, without referring to any specific criminal statute being violated, *see N.J.S.A.* 2C:25–19, whether the proofs before him were sufficient to constitute an act of domestic violence.[2] The judge appeared to find a threat, presumably a terroristic threat, *see N.J.S.A.* 2C:12–3 and *N.J.S.A.* 2C:25–19(3), rather than harassment, *see N.J.S.A.* 2C:33–4 and *N.J.S.A.* 2C:25–19(13), under the Act.

The judge noted that in seeking a restraining order some people come to court with the intent of gaining an advantage in an impending divorce action in order to obtain custody of the children

---

[2] *N.J.S.A.* 2C:25–19 defines "Domestic Violence" as "one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor:

| | | |
|---|---|---|
| (1) | Homicide | *N.J.S.* 2C:11-1 *et seq.* |
| (2) | Assault | *N.J.S.* 2C:12–1 |
| (3) | Terroristic threats | *N.J.S.* 2C:12–3 |
| (4) | Kidnapping | *N.J.S.* 2C:13–1 |
| (5) | Criminal restraint | *N.J.S.* 2C:13–2 |
| (6) | False imprisonment | *N.J.S.* 2C:13–3 |
| (7) | Sexual assault | *N.J.S.* 2C:14–2 |
| (8) | Criminal sexual contact | *N.J.S.* 2C:14–3 |
| (9) | Lewdness | *N.J.S.* 2C:14–4 |
| (10) | Criminal mischief | *N.J.S.* 2C:17–3 |
| (11) | Burglary | *N.J.S.* 2C:18–2 |
| (12) | Criminal trespass | *N.J.S.* 2C:18–3 |
| (13) | Harassment | *N.J.S.* 2C:33–4 |
| (14) | Stalking | *P.L.* 1992, *c.* 209 (C.2C:12–10)." |

or possession of the home or both.[3]   In evaluating the evidence, the judge observed that the words "that were used that particular night ... did not, even by the plaintiff's admission, contain a threat to kill voiced by the defendant." The judge acknowledged that both parties told conflicting stories, and that defendant denied ever threatening the life or safety of the plaintiff.  The judge felt that the testimony of plaintiff's father, Phillips, essentially tipped the balance in her favor because the judge could not comprehend what Phillips would gain by testifying, even though it was on behalf of his daughter.   The judge said Phillips:

wouldn't willfully get up here and lie about it just to gain an advantage for his daughter.  He could just as well let the matrimonial action proceed on its own and let it resolve on itself.

The judge then concluded that plaintiff was credible and that threats were made which put her in fear of her life, based upon the totality of the circumstances.  He considered that defendant's words "I do have a choice," had implications beyond the literal meaning of those words.  Thus, the judge issued a restraining order, and ordered an evaluation of defendant with regard to custody and visitation.

Aside from legal issues, our scope of review is normally limited to whether there was sufficient credible evidence to support the trial judge's finding that an act of domestic violence had been committed.  *State v. J.T.*, 294 *N.J.Super.* 540, 544, 683 *A.2d* 1166 (App.Div.1996).  To support such a finding where there is no actual physical abuse, the court must find by a preponderance of the evidence that the defendant committed one of the enumerated

[3] In *Murray v. Murray*, 267 *N.J.Super.* 406, 631 *A.2d* 984 (App.Div.1993), we noted "the serious policy implications of permitting allegations of this nature to be branded as domestic violence and used by either spouse to secure a ruling on critical issues such as support, exclusion from marital residence and property disposition, particularly when aware that a matrimonial action is pending or about to begin." *Id.* at 410, 631 *A.2d* 984.  Traditional remedies have long existed for obtaining appropriate relief. *See, e.g., Degenaars v. Degenaars*, 186 *N.J.Super.* 233, 452 *A.2d* 222 (Ch.Div.1982); *Roberts v. Roberts*, 106 *N.J.Super.* 108, 254 *A.2d* 323 (Ch.Div.1969).

classes of prohibited conduct in *N.J.S.A.* 2C:25–19 *and* that there was a "previous history of violence between the parties including previous threats, harassment and physical abuse. . . ." *Peranio v. Peranio,* 280 *N.J.Super.* 47, 54, 654 *A.*2d 495 (App.Div.1995); *see also Corrente v. Corrente,* 281 *N.J.Super.* 243, 247, 657 *A.*2d 440 (App.Div.1995) (recognizing that the Act was designed to address "regular serious abuse between spouses"). We do not generally disturb a judge's fact-findings unless there was a palpable abuse of discretion, that is the findings "are so wide of the mark that a manifest denial of justice resulted." *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982); *Formosa v. Equitable Life Assurance Society,* 166 *N.J.Super.* 8, 20, 398 *A.*2d 1301 (App.Div.), *certif. denied,* 81 *N.J.* 53, 404 *A.*2d 1153 (1979). The judge's finding here of an act of domestic violence on July 9, 1996, resulted in a manifest denial of justice.

*N.J.S.A.* 2C:12–3b makes it a crime of the third degree to "threaten[ ] to kill another with the purpose to put him in *imminent fear* of death under circumstances *reasonably* causing the victim to believe the immediacy of the threat and the *likelihood that it will be carried out.*" (Emphasis supplied). Whether a terroristic threat has been made must meet the statutory criteria for such an offense and be measured by an objective standard, "the reasonableness of the victim's fear," *State v. Smith,* 262 *N.J.Super.* 487, 517–518, 621 *A.*2d 493 (App.Div.), *certif. denied,* 134 *N.J.* 476, 634 *A.*2d 523 (1993), giving due regard to the circumstances under which the statements were made. *State v. Nolan,* 205 *N.J.Super.* 1, 4–5, 500 *A.*2d 1 (App.Div.1985). The "gravamen of the offense involves the communication of a threat to kill in such terms as would in the attendant circumstances convey to an ordinary individual that the language seriously threatened death." *State v. Kaufman,* 118 *N.J.Super.* 472, 474, 288 *A.*2d 581 (App.Div.), *certif. denied,* 60 *N.J.* 467, 291 *A.*2d 17 (1972).

*State v. Butterfoss,* 234 *N.J.Super.* 606, 611–612, 561 *A.*2d 312 (Law Div.1988), outlined the requisites for sustaining the sufficien-

cy of an indictment as to a count charging terroristic threats. Butterfoss was indicted by the grand jury for making terroristic threats to his estranged wife when he picked up his wife and daughter from nursery school and told his wife that he intended to take their daughter from her and go to California (which he did) and planned to tie up and gag the mother if she was uncoopera- tive. The wife observed a paper bag on the floor of the car containing small pieces of rope and cloth. The court reasoned that the question of whether defendant made terroristic threats depended on:

> whether the surrounding circumstances were such that an ordinary person in the mother's position would have felt threatened and whether the defendant intended to frighten her; whether he intended to carry out the threat or whether the fear of the victim was actually induced are immaterial.

[*Id.* at 612, 561 *A.*2d 312].

The court concluded that the defendant intended to terrorize his wife by threatening to tie her up and take their child, and that this intent was evidenced by the rope and cloth being in the car. *Ibid.*

We recognize that *Butterfoss* was decided in the context of a challenge to a criminal indictment, and would be subject to the more onerous criminal standard, but under either the civil or criminal standard there is no evidence in the record of the instant matter that defendant's statements made on the evening of July 9, 1996, were intended to put his wife in imminent fear for her life. Looking at the statements objectively in the context of the argu- ment, the trial judge noted the words "that were used that particular night ... did not, even by the plaintiff's admission, contain a threat to kill voiced by the defendant." The judge went on, however, and employed a subjective test in finding that defendant's remarks constituted threats to plaintiff. Instead, the judge should have determined whether a reasonable person would understand defendant's statement that he had "choices" regarding potential matrimonial litigation and his inquiries of whether his wife was coming to bed as terroristic threats. Whether plaintiff said she feared for her life as a result of defendant saying he had

choices is not determinative. *See State v. Nolan, supra,* 205 *N.J.Super.* at 4, 500 *A.*2d 1.

■ An ordinary person in those circumstances would not perceive defendant's statement on that occasion as a threat of any kind of violence. Defendant's statement that he had "choices" was made in response to his wife's assertion that he would be powerless to gain custody of the children and the marital home. Defendant was entitled to respond in that discussion. By the judge's logic even if defendant said "no you won't" or "I will fight you on that" he would have reached the same result. This would be contrary to common sense. It would also allow a party to hold past conduct[4] over the head of the other party like the sword of Damocles. It cannot be said that defendant's conduct or comments on July 9, 1996, were inappropriate or improper or that there was no justification for his comments. *See N.B. v. T.B.,* 297 *N.J.Super.* 35, 41, 687 *A.*2d 766 (App.Div.1997). Defendant's comments may be characterized as reasonable, expected responses given the context of the verbal exchange, and cannot qualify as prohibited conduct. *See Corrente v. Corrente, supra,* 281 *N.J.Super.* at 247–250, 657 *A.*2d 440 (explaining that the Act was designed to address "regular serious abuse" and not "ordinary domestic contretemps").

■ While terroristic threats and harassment are crimes, the thrust of the Act is to somehow transmogrify those crimes[5] into some lesser offense not a "crime," but nonetheless with potential serious penal consequences, when the victim signs the complaint. *See N.J.S.A.* 2C:25–28. Because of the references to criminal acts as being acts of domestic violence and the internal conflicts in the

---

[4] We are not deciding whether past conduct has relevancy in the matrimonial action.

[5] See listing in footnote 2, *supra.* Anomalously, the legislative findings and declaration in *N.J.S.A.* 2C:25–18 state that "domestic violence is a serious *crime* against society...." (emphasis supplied). Likewise, *N.J.S.A.* 2C:25–21 on several occasions refers to law enforcement officers serving a "criminal complaint" for acts of domestic violence. *See also N.J.S.A.* 2C:25–28.

statute and its placement in the Penal Code, some brief comment is in order. The Act, although codified in the Penal Code, effectively requires what might otherwise be criminal acts to be then treated as if born of a civil cause of action and under the burden of proof standard for civil cases, *i.e.*, a preponderance of the evidence, *see N.J.S.A.* 2C:25–29, rather than proof beyond a reasonable doubt as in criminal cases. Thus, to be found to have committed an act of domestic violence, a party must have committed what is in effect or would have been a crime under the Penal Code.

The Penal Code in *N.J.S.A.* 2C:25–28 treats domestic violence complaints signed by non-law enforcement officers,[6] *i.e.*, persons claiming to be victims, and alleging what are criminal acts, as something other than a criminal offense and directs the use of the lesser burden of proof of preponderance of the evidence. *N.J.S.A.* 2C:25–28. The result is to circumvent the protections normally accorded an accused in a criminal case, including the right to a jury trial and the potential defense of double jeopardy. A closer examination of the Act and whether the Legislature can properly make what would be a criminal act for some, an act not criminal for others, perhaps even depending upon who signs the complaint, and whether this implicates constitutional issues, are left for another case.

We are mindful that the dissolution of a marriage is often acrimonious. But such acrimony should not be used as a weapon

---

[6] The statutory scheme requires a law enforcement officer to file a criminal complaint. *N.J.S.A.* 2C:25–21. A victim may file a domestic violence complaint, *see N.J.S.A.* 2C:25–28, alleging what would constitute a specified crime itemized in *N.J.S.A.* 2C:25–19, but the charge of domestic violence is treated as if it is not a crime. Thus, it appears from the statutory scheme that depending upon who signs the complaint the act complained of may or may not be criminal. This is so despite the Legislature's declaration that domestic violence is a "serious *crime* against society." *N.J.S.A.* 2C:25–18 (emphasis added). Presumably, a victim could also file a criminal complaint for any of the offenses referred to in *N.J.S.A.* 2C:25–19, or even seek equitable relief in a matrimonial action in the Family Part. The Act is hardly clear when trying to harmonize its components.

to gain a strategic advantage in the matrimonial court,[7] thus, trivializing and distorting the beneficial purpose of the Act to protect against regular abusive behavior. *See Peranio v. Peranio, supra,* 280 *N.J.Super.* at 52, 654 *A.2d* 495. Matters, such as the present case, which do not necessarily rise to the level of domestic violence can be, and should be addressed by the Chancery Division, Family Part under its equitable powers. *See N.B. v. T.B., supra,* 297 *N.J.Super.* at 42, 687 *A.2d* 766.

Reversed.

---

[7] The divorce complaint between these parties was filed about four months after the domestic violence trial.