# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2946-23
A-2986-23

J.L.D.,[1]

    Plaintiff-Respondent,

v.

S.H.,

    Defendant-Appellant.

_____

S.H.,

    Plaintiff-Appellant,

v.

J.L.D.,

    Defendant-Respondent.

_____

Submitted March 17, 2025 – Decided April 3, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

---

[1]  We use the parties' initials and fictitious names to protect the confidentiality of the victims of domestic violence.  R. 1:38-3(d)(10).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket Nos. FV-07-2495-24 and FV-07-2539-24.

Connell Foley, LLP, and Jewish Family Services Metrowest Rachel Coalition, attorneys for appellant (Suzanne Jacqueline Groisser, of counsel; Patricia A. Lee, Veronica Chmiel, and Keara Walsh, of counsel and on the brief).

Respondent has not filed a brief.

PER CURIAM

In these consolidated appeals, S.H. ("Sarah") appeals a final restraining order ("FRO") granted to respondent J.L.D. ("Jerry") pursuant to the Prevention of Domestic Violence Act ("PDVA"), N.J.S.A. 2C:25-17 to - 35, and an order dismissing her temporary restraining order ("TRO") against Jerry. At the conclusion of an evidentiary hearing on both matters, the Family Part issued an oral decision, finding Jerry had proved the predicate act of harassment and the second prong of Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006), and entered an FRO against Sarah. With respect to Sarah's application, although the trial court found Sarah had proved the predicate acts of assault and harassment, it concluded she failed to demonstrate immediate risk of danger pursuant to the second Silver prong and denied her request for an FRO.

Because the trial court erred in holding that Jerry had proved Sarah committed the predicate act of harassment and misapplied the legal standard in deciding whether to grant Sarah an FRO against Jerry, we vacate the trial court's April 15, 2024 orders, reinstate the parties' respective TROs dated January 24, 2024, and January 26, 2024, and remand for new FRO hearings before a different trial court judge.

I.

Sarah and Jerry were in a relationship for over ten years and have three children together. The parties lived with their three shared children and Sarah's child from a previous relationship. On January 24, 2024, Jerry filed a domestic violence complaint and requested a TRO against Sarah based on the predicate act of harassment, which was granted the same day. Two days later, on January 26, 2024, Sarah filed a domestic violence complaint and request for a TRO against Jerry based on the predicate acts of assault, criminal mischief, and harassment, which was granted on the same day. Both parties thereafter amended their initial TRO complaints.

On April 15, 2024, the Family Part held an FRO hearing. Sarah and Jerry both testified and were self-represented at the hearing. Because Jerry had obtained a TRO first, the Family Part allowed him to present his case first. Jerry

testified that as of January 2024 he was no longer in a relationship with Sarah. In December 2023, Jerry had moved out of their shared residence because of the events he described in his TRO complaint.

He alleged, on approximately December 15, 2023, Sarah walked into the parties' bedroom with a knife in her hands and made threats towards him and the children. She said Jerry did not know "what it's like to have intrusive thoughts about wanting to see your kids dead and you killing yourself afterwards." She then allegedly made threats to Jerry, stating she wanted to see him "go to hell over and over again, multiple different times." Sarah did not point the knife at Jerry but held it in her hand when she spoke to him. Jerry testified Sarah's actions caused him to feel "scared," and he "didn't expect" Sarah to act in that way "at all." He also testified that after Sarah made those comments while she had the knife in her hand, he had taken the knife from her, which he was able to do readily because of his much larger size.

He stated that although this incident was the first time Sarah had made threats regarding killing the children, it was not the first time she had referred to having intrusive thoughts. He said he believed Sarah was struggling with her mental health at the time she had made the statements, after the birth of their third child, Sarah was diagnosed with "postpartum depression, anxiety, and

A-2946-23

rage." He did not present corroborating evidence of those diagnoses. He added Sarah was non-compliant with medication prescribed to her. Jerry testified Sarah had not made any more threats after the knife incident "but all throughout [their] relationship threats were being made or insinuated."

After the trial court provided the legal definition of "threatening," Jerry testified Sarah's messages to him would cause a reasonable person to think they were intended to cause fear and alarm. Jerry also submitted into evidence three text messages from Sarah that were sent on December 26, 2023, in which she said in part, "I know me being gone is what will solve all your problems and I've only ever wanted to give you what you want . . . ." He testified he found her threat of self-harm to be alarming. Jerry then testified Sarah had attempted suicide at the end of December 2023.

The trial court asked Jerry if he had any additional text messages from December 2023 to January 2024 reflecting Sarah's desire to harm him. He testified Sarah had texted him, "I hope you burn along in hell right along with everyone else who condones your BS," which scared him because he interpreted her text message as a threat "that [Sarah] was go[ing to] send [him] to hell."

In addition, Jerry entered into evidence a text message from Sarah from January 14, 2024, in which she said, "[y]'all gonna [sic] perish and that's on

5

[G]od." He testified this text caused him to fear for his safety. When asked if he believed Sarah was dangerous to him, he responded he did because of her "serious hate for" him. He also testified he did not believe Sarah would stop her behavior without an FRO.

In addition, Jerry admitted into evidence a recorded voicemail from Sarah, in which she stated the following:

> And that's the sh[*]t I'm talking about right there. You think that you are allowed and supposed to talk to me and about me any way that you want and then when the energy is returned, you don't f[******] like it. Your daughter needs sh[*]t that she's been telling you she needs and you're telling her she don't [sic] need it. Your f[******] son needs formula and you not [sic] buying him sh[*]t . . . mother f[******] buying it. How about you do your job as a f[******] parent?
>
> You f[******] lazy a[**] bum. You're a lazy a[**] bum and that ain't [sic] a f[******] an insult and that's not my opinion. That's the truth. You're a lazy f[******] bum. Your kids need sh[*]t and they telling [sic] me that they need sh[*]t and they telling [sic] me that they told you and you want to act like that. So go put your phone on do not disturb to go deal with that . . . so that you can ignore your kids. It's A-O f[******] kay. It's A-O f[******] kay. Watch what's coming for your a[**].

After listening to this voicemail, the Family Part judge stated it "[s]ounds like an argument about whether you're giving sufficient parental support." In

6

response, Jerry testified he believed the last sentence in the voicemail, "[w]atch what's coming for your a[**]" was a threat.

In her testimony responding to Jerry's claims, Sarah disputed Jerry's allegations regarding the December knife incident. Sarah testified they had been celebrating their daughter's birthday and there was a knife in the game room to cut her birthday cake. She denied ever holding a knife while making statements of self-harm or expressing a desire to harm her children.

Sarah acknowledged she had been "hospitalized for mental health reasons." The court asked Sarah whether she was taking medication at the time of the FRO hearing, and she replied she was not. The court also asked Sarah whether she had taken medication for any mental-health diagnoses in the past, which Sarah admitted she had. Sarah claimed Jerry had encouraged her to stop taking her medications.

Sarah did not deny she had attempted suicide in December of 2023 and responded affirmatively when the court asked if this was "a symptom of postpartum depression." She testified the parties had been arguing earlier on the day she had attempted suicide. According to Sarah, she was asking Jerry to come home and not work overtime that day because she had been experiencing panic attacks. She testified Jerry hung up on her, mocked her mental health, and

then told her: "why don't you just pack all your things and leave? What do you want me to do? Take one of the kids, two of the kids? I'll take all four of your kids from you." Sarah testified she did not intend to threaten Jerry with her text message: "I did not think that telling him to go to hell is anything that was a threat."

Sarah then testified as to her own domestic violence complaint and request for an FRO against Jerry. She first described an argument that occurred on December 12, 2023, when she was asking Jerry for more help with housework. During the argument, Jerry allegedly "body slammed [her] . . . onto [their daughter's] toddler bed," with such force, it broke. After this incident, Sarah was "in shock," packed a suitcase, and planned to go to her mother's house. But when she reached the bottom of the steps, law enforcement officers had arrived, having received a call of domestic violence from an "unknown individual." She testified Jerry "ha[d] always told [her] . . . that if [she] called the cops or if [she] had gotten the law involved in anyway [sic] that he would take [her] children away from [her]." Therefore, she did not say anything to the police about the assault. She testified the next day she noticed she had bruising all over the right side of her body. She submitted photographs of the bruises into evidence.

A-2946-23

The Court asked Sarah about the parties' past history and whether there were other episodes of violence during the course of their relationship. Sarah testified:

> It was always verbal arguments that led into more physical arguments. There would be plenty of times where [Jerry] would literally throw me onto the floor and I would tell him I'm never trying to hurt you when we're arguing and you're literally putting your hands on me and throwing me onto the floor. I was 105 pounds during that time and [Jerry] was well over 200, so he could never see me as a threat because I was never doing—I can't even hurt him if I wanted to.
>
> We also in [sic] a couple of times he would just talk down on me in front of my kids and anytime that I would like talk back to him about those—about that nature he would get physical as well.

She described one incident where Jerry punched her on the side of her face, and another where Jerry threw her on the floor.

Regarding verbal threats, Sarah testified although Jerry had not made threats of violence towards her, he would repeatedly threaten to take the children away from her. She also testified she believed Jerry was dangerous to her. She provided an example that occurred in December 2023 when Jerry continuously told her she needed to schedule an appointment for an abortion after he found out she was pregnant again, and she made the appointment because if she did not make the appointment, there would be "consequences."

9

The court then instructed Sarah as to the legal standard she was required to meet: "you have to demonstrate to me that he's immediately dangerous and . . . what that means is if I don't give you a[n] [FRO] there's a risk if he saw you on the street he would come over and stab you or run you down with a car or something horrifying." The court then asked: "[d]o you . . . think that he is capable of that kind of horrifying behavior? And if yes, . . . give me an example of what makes that so." Sarah answered: "every time [Jerry] has ever done something to [her] he always threatened that if [she] called the police that he would take the kids away from her," to which the court replied: "tak[ing] the kids doesn't make him dangerous . . . . [T]hat makes him maybe an overbearing parent." Sarah testified she believed he was dangerous because she "feel[s] like . . . if things don't go his way that something is gonna [sic] happen to [her]."

The trial court then asked the following:

> All right. So let's say I'm not satisfied that he's actually dangerous to you. Do you think you are at risk of additional future abuse?
>
> [SARAH]: I don't know.
>
> THE COURT: You don't know whether he will continue to bother you?
>
> [SARAH]: I feel like the only thing that he would do is possibly just continue to like disparage me in front of my children, . . . or . . . if I don't have it set up how

10

we do now where we at least have to meet at a common place for exchange of the children that he would possibly try to do something. But I'm not sure.

Sarah alleged Jerry had filed the TRO against her in retaliation for her calling the police. She also explained she had finally filed a TRO complaint against Jerry because: "[she has] always wanted to file a restraining order, but [Jerry] has always said that if [she] contacted the police or got the law involved that he would take [her] kids away. And at that point he had done it anyway."

Jerry waived his right to cross-examine Sarah and instead elected to provide a statement in response to her testimony. Jerry stated he had never physically assaulted Sarah and he wanted Sarah to see their children but continued to be concerned about her mental health. He denied ever threatening to take the children away from her.

At the conclusion of the FRO hearing, the court issued an oral decision, stating:

> [Jerry] reports that there was an episode that took place in and around January 15th where [Sarah] came into the bedroom with a kitchen knife in her hand and said words to the effect, I want you to go to hell. I've been thinking about killing myself and killing our children and said something, you have no idea what it's like to have these intrusive thoughts. Which I . . . take to be an acknowledgment of . . . her peril, an acknowledgment that she knew that she was losing control over her mind at the time.

And I want to be clear that although . . . [Jerry] described it as quite a large knife, he also said that he was not so afraid that she would hurt him that he did not disarm her and he successfully took that knife away from her without any injury to either of them.

So while . . . I think she was in the throes of an event . . . I do believe the event happened and I do believe that it was related to the mental health crisis . . . and it's certainly very, very concerning and very anxiety provoking. But the fact that you could disarm her without any injury to her . . . tells me that she was not immediately dangerous at that moment.

Despite that finding, the court found Jerry had met the predicate act of harassment. To reach that conclusion, the court relied on Sarah's suicide attempt, her decision to not take prescribed medications, her "disturbing text messages" to Jerry regarding her "being gone will solve all [Jerry's] problems" and "references to going to hell," and her voicemail where she stated "[w]atch what's coming for you next." The court also relied upon assumptions about Sarah's health unsupported by expert medical opinion, and on the "very strong evidence in the domestic violence literature that any person who threatens to harm is a risk to their partner, male or female." The court stated: "[e]ven though on that day maybe [Sarah] wasn't a risk . . . there was a potential for risk and [the court] relied on the literature more than the story that [Jerry] tell[s] here today."

A-2946-23

After providing the legal definition of harassment pursuant to N.J.S.A. 2C:33-4, the court ruled it did not believe "under subsection (c) [of N.J.S.A. 2C:33-4] there was an intention by [Sarah] to intentionally cause [Jerry] great alarm. But [the court] also . . . believe[s] that [Sarah] simply could not help herself in those moments and that they did cause [Jerry] annoyance and alarm."

Addressing the second prong of <u>Silver</u>, the court stated:

> [B]ased on what has been developed here, which is the nature of the treatment that [Sarah] is ongoing [undergoing] and . . . there's a level of informality to it that I am not entirely comfortable with. I'm not saying prescription drugs are the be and end all, but I . . . need more evidence that there is ongoing counseling and therapy here so that this doesn't cycle again. Particularly since you tell me that you are pregnant again and that there's all sorts of evidence out there that the powerful hormones and chemicals that allow a woman's body to make and sustain human life can also damage the party that bears that life and I think maybe that might be your situation.
>
> And so given that you do have other children in common and given how young they are, I say with no joy here that I do think I have to give [Jerry] a[n] [FRO].

After granting Jerry's FRO, the court turned to Sarah's complaint and request for an FRO. It made findings of fact and recited the legal definitions for the predicate acts alleged, including assault, harassment, and criminal mischief. The court found Sarah had proved both assault and harassment by a

preponderance of the credible evidence but not criminal mischief relating to the damage to the toddler's bed because the damage was "incidental." The court found Sarah had proved prong one of <u>Silver</u> because she had proved the predicate acts of assault and harassment.

Turning to the second prong of <u>Silver</u>, the court found Sarah had failed to establish she was in immediate danger or at risk of future abuse. It stated:

> But the second prong is where I'm troubled for you. And on this fact pattern, the danger that you complain about is not really met under the record. So you said you felt he was dangerous, in part because of the remarks he made to you . . . regarding this pregnancy where he wanted you to have an abortion. You claim that he talks down to you and uses the children as a threat.
>
> But your testimony is that, I just feel like something will happen. And that's really speculative and you claim that, quote, "Probably he would have done something to me[."] You also said, quote, "He would try to do something to me. I'm not sure." So I'm not satisfied that you make out the danger that's necessary.
>
> I'm never . . . happy when there's a risk of danger to either party and so . . . I don't believe on your fact pattern that [an FRO] is appropriate here. But I will say, sir, you did contact her numerous times before you were served, which to me suggests that . . . maybe you're not so scared of her after all.

14

The court denied Sarah's FRO request and dismissed her TRO complaint against Jerry. These appeals followed, which were consolidated on Sarah's motion. Jerry did not respond to the appeals.

II.

Our review of an FRO is generally limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to the Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)); see also S.K. v. J.H., 426 N.J. Super. 230, 238 (App. Div. 2012). Consequently, findings by a court "are binding on appeal when supported by adequate, substantial, credible evidence." T.M.S. v. W.C.P., 450 N.J. Super. 499, 502 (App. Div. 2017) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)).

However, we do not accord such deference to the court's legal conclusions, which we review de novo. C.C., 463 N.J. Super. at 428-29. Questions of law "are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles." R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J.

A-2946-23

Super. 205, 215 (App. Div. 2015)); see also D.M.R. v. M.K.G., 467 N.J. Super. 308, 325 (App. Div. 2021) (reversing the trial court's entry of an FRO due to lack of findings, no prior history of domestic abuse existing between the parties, and plaintiff's lack of fear).

When determining whether to issue an FRO pursuant to the PDVA, the Family Part is required to make two distinct determinations. Silver, 387 N.J. Super. at 125-27. First, the trial court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19[(a)] has occurred." Id. at 125. Second, if a court finds a predicate act occurred, "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322.

A.  Whether the Trial Court Erred in Entering an FRO Against Sarah.

N.J.S.A. 2C:25-19 enumerates the offenses that amount to predicate acts of domestic violence, including harassment. See Silver, 387 N.J. Super. at 122. Harassment occurs whenever one does the following:

> a. Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;

16

b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4.]

Conduct qualifies as harassment only if it is committed with both a purpose to harass and if the act is "likely to cause annoyance or alarm." J.D., 207 N.J. at 485 (quoting N.J.S.A. 2C:33-4(a)). "Harassment requires the defendant act with the purpose of harassing the victim." D.M.R., 467 N.J. Super. at 323. "A finding of a purpose to harass may be inferred from the evidence presented and from common sense and experience." Ibid. (quoting H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003)) (internal quotation marks omitted).

The court considered Sarah's "behaviors in combination with disturbing text messages" and the voicemail, and stated, "[t]here's . . . very strong evidence in the domestic violence literature that any person who threatens to harm is a risk to their partner, male or female. Very strong evidence of that. And so, I must rely on that literature here." The court did not identify the literature to which it was alluding, and no literature was admitted into evidence. The court concluded it was "satisfied that that behavior could constitute harassment. . . ."

I do not believe in their time that especially under subsection (c) there was an intention by [Sarah] to intentionally cause [Jerry] great alarm. But I also . . . believe that she simply could not help herself in those moments and that they did cause [Jerry] annoyance and alarm. And so I am satisfied that harassment is proven here.

Because the trial court found that Sarah did not intend to "cause [Jerry] great alarm," it erred in concluding that the predicate act of harassment was met. Further, the trial court did not describe what specific "moments" caused Jerry annoyance or alarm, and whether the text messages and voicemail entered into evidence demonstrated harassment pursuant to N.J.S.A. 2C:33-4(a). To find that Sarah had committed the predicate act of harassment, the trial court was required to find Sarah had "act[ed] with the purpose of harassing" Jerry, which the trial court explicitly stated it did not find. D.M.R., 467 N.J. Super. at 323. Moreover, even if the trial court found Jerry's testimony about the knife incident credible, Sarah had threatened to harm herself or the children; at no point did she threaten to harm Jerry. The trial court also erred in considering evidence of "domestic violence literature" that was not presented by either party at trial and nor cited by the court with any particularity.

18

Because both prongs of Silver must be met and Jerry failed to establish the predicate act of harassment, we vacate the trial court's April 15, 2024 FRO entered against Sarah.

B.   Whether the Trial Court Erred in Denying Sarah's FRO Against Jerry.

Having found Jerry committed both the predicate acts of assault and harassment by a preponderance of the evidence, the trial court was compelled to examine whether an FRO should issue against Jerry.  "The guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 127).  Pursuant to N.J.S.A. 2C:25-29(a), at an FRO hearing the court "shall consider but not be limited to the following" enumerated factors:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court . . . .

[N.J.S.A. 2C:25-29(a).]

Here, the trial court erred as it applied the wrong legal standard. During Sarah's testimony regarding why she believed Jerry was dangerous to her, the trial court explained the legal standard as:

> So the legal standard is you have to demonstrate to me that he's immediately dangerous and so what that means is if I don't give you a[n FRO] there's a risk if he saw you on the street he would come over and stab you or run you down with a car or something horrifying. Do you . . . think that he is capable of that kind of horrifying behavior? And if yes, . . . give me an example of what makes that so.

The trial court erred in focusing on whether Jerry posed imminent danger to Sarah, and not whether an FRO was necessary to prevent further abuse. A.M.C., 447 N.J. Super. at 414 (quoting Silver, 387 N.J. Super. at 127).

Although the court later asked Sarah, "[d]o you think you are at risk of additional future abuse," and in its oral decision recited the correct standard, the

20                                                                              A-2946-23

court focused solely on whether Jerry presented an immediate danger – an incorrect and significantly higher burden. She stated that "the danger that [Sarah] complain[ed] about is not really met under the record" and concluded, "[s]o I'm not satisfied that you make out the danger that's necessary." As questions of law "are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles" in our review, and the court questioned Sarah on a misunderstanding of the applicable legal principles, we reverse the trial court's order dismissing Sarah's TRO. R.G., 449 N.J. Super. at 218 (quoting N.T.B., 442 N.J. Super. at 215).

Further, the trial court erred in denying Sarah's FRO for failure to meet the second prong of Silver. "In determining whether a restraining order is necessary, the judge must evaluate the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6) and, applying those factors, decide whether an FRO is required 'to protect the victim from an immediate danger or to prevent further abuse.'" D.M.R., 467 N.J. Super. at 324 (quoting Silver, 387 N.J. Super. at 127).

To make the determination pursuant to the second prong of Silver, a court should consider "[t]he nonexclusive statutory factors includ[ing] the 'previous history of domestic violence between [the parties], including threats, harassment and physical abuse,' the 'existence of immediate danger to person or property,'

A-2946-23

and the 'best interests of the victim and any child.'" N.T.B., 442 N.J. Super. at 223 (quoting N.J.S.A. 2C:25-29(a)(1) to (2), (4)). In addition, the court should consider "[a]ny pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights . . . ." N.J.S.A. 2C:25-29(a)(7). Although the trial court is not required to incorporate all these factors in its findings, "the [PDVA] does require that 'acts claimed by a plaintiff to be domestic violence . . . be evaluated in light of the previous history of violence between the parties.'" Cesare, 154 N.J. at 401-02 (omission in original) (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)).

After finding Sarah had met prong one of Silver because she proved the predicate acts of assault and harassment, the trial court addressed the second prong and stated:

> But the second prong is where I'm troubled for you. And on this fact pattern, the danger that you complain about is not really met under the record. So you said you felt he was dangerous, in part because of the remarks he made to you . . . regarding this pregnancy where he wanted you to have an abortion. You claim that he talks down to you and uses the children as a threat.

However, the trial court came to this conclusion without considering any of the statutory factors pursuant to N.J.S.A. 2C:25-29(a). Although the trial

court acknowledged the parties' history of domestic violence in its decision to grant Jerry's FRO against Sarah, it did not mention or consider the history of domestic violence in denying Sarah's request for an FRO and dismissing her TRO against Jerry.

In addition, throughout the FRO hearing and in its oral decision, the court failed to consider Sarah's allegations that Jerry would "use[] the children as a threat" against Sarah and that he threatened her that "if [she] called the cops or if [she] had gotten the law involved in any[ ]way that he would take [her] children away from [her]." These allegations should have been considered by the court in its final determination pursuant to N.J.S.A. 2C:25-29(a)(7), because Jerry's alleged threats "interfere[d] with[] [and] threaten[ed]" Sarah's "liberty, freedom, bodily integrity, or human rights." "Coercive control may include[] . . . threatening to deny or interfere with an individual's custody or parenting time," which the trial court failed to consider when Sarah testified regarding Jerry's threats to remove their children from her custody. N.J.S.A. 2C:25-29(a)(7)(g).

Sarah asks this court to reverse both of the April 15, 2024 orders, which would have the effect of denying Jerry an FRO and granting Sarah an FRO. We conclude given the evidence presented at trial, the better and fairer course is to

23

vacate the orders and to remand the cases for a new trial before a different Family Part judge. Freedman v. Freedman, 474 N.J. Super. 291, 308 (App. Div. 2023) (remanding a matter to a different judge because the original judge "expressed comments regarding credibility" and "may have a commitment to her prior findings"). The new judge can make credibility determinations and factual findings free from assumptions about Sarah's physical and mental health that were not supported by expert medical opinion and reliance on uncited literature that was not admitted into evidence.

Therefore, we vacate both of the April 15, 2024 orders, reinstate the parties' TROs, and remand for a new FRO hearing before a different trial court judge.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division