# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4753-18T3

R.S.B.,

    Plaintiff-Respondent,

v.

K.J.Z.,

    Defendant-Appellant.

_____

Submitted March 25, 2020 – Decided April 24, 2020

Before Judges Koblitz and Gooden Brown.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-1718-19.

Kirah Michele Addes, attorney for appellant.

Lesnevich, Marzano-Lesnevich, O'Cathain & O'Cathain, LLC, attorneys for respondent (Carlye L. Goldstein, on the brief).

PER CURIAM

Defendant K.J.Z. appeals from a June 6, 2019 Final Restraining Order (FRO) issued pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, following a finding of harassment. Plaintiff R.S.B. and defendant, a police officer, were involved in an extramarital affair for about one year prior to the entry of the Temporary Restraining Order (TRO). Plaintiff sought a TRO alleging two instances of harassment. The first instance occurred while defendant was driving plaintiff in his car when he took out his gun while speeding down the freeway and threatened to kill himself. The second instance involved a phone call where defendant repeatedly accused plaintiff of revealing private information about him and demanded she delete certain messages between them. Plaintiff also alleged prior harassing behavior.

At trial, plaintiff presented recordings and testified to numerous instances where defendant made threatening comments about harming her husband, expressed his inability to control his aggression, and threatened self-harm if plaintiff left him. The trial court found plaintiff's testimony credible and, after an analysis of the two-part test set forth in Silver v. Silver, 387 N.J. Super. 112, 125–27 (App. Div. 2006), issued an FRO against defendant.

A-4753-18T3

Defendant argues on appeal that the court's credibility findings were not supported by the record, no evidence of a predicate act of harassment or a prior history of domestic violence was demonstrated, and the court improperly admitted selected portions of messages from defendant. We reject these arguments and affirm.

I.

The court heard testimony from plaintiff, a defense expert and defendant's wife over five days. Defendant did not testify. The evidence revealed the following facts. Plaintiff and defendant met around April 2018 and shortly thereafter became involved in an extramarital affair for approximately one year. Defendant was employed as a police officer by the Upper Saddle River Police Department. The parties communicated daily via text messages, phone calls, and Snapchat.

Plaintiff told defendant that her husband became angry with her at times. She said her husband knocked a chair over on one occasion, and punched a hole in the wall on another. When hearing this, defendant became upset, making "nasty" remarks about her husband.

Plaintiff offered into evidence photographs of her cell phone showing Snapchat messages between the parties. The portions of the conversations

A-4753-18T3

revealed defendant's strong feelings for plaintiff and his concern about her relationship with her husband. The court pointed out that defendant wrote: "I'm just worried how I'll take out my aggression. I'm very angry this week" and "I wan[t] [to] bury him for what he[] does to you . . . and your girls . . . . And I'm so angry I see it in how I'm interacting with people."

The first instance of harassment took place on the evening of January 10 into the early morning of January 11, 2019 (the January 10 incident). That night, plaintiff and defendant went to a hotel in Nyack, New York with two friends. They argued after plaintiff told defendant she could not "do this anymore." As defendant was speeding down the freeway, he "said he couldn't live without [plaintiff] and he was going to kill himself if he couldn't have [her]." Plaintiff testified that defendant "pulled his gun out" and was "waving it around." Plaintiff began secretly recording defendant on her cell phone. The court stated that the video, which was introduced into evidence, was predominantly black, however the audio was audible.

Defense counsel called an expert who testified that the flash of light shown at the end of the video was consistent with the lights in the parking area of the store where the parties stopped to pick up their friend. The court found that the expert's testimony was not inconsistent with plaintiff's testimony and

4

stated that plaintiff "explained that she took the video because of defendant's behavior during the ride."

Plaintiff testified that later that night she contacted an Upper Saddle River Police sergeant. She met him and showed him the video. The court found this testimony to be credible. Following the January 10 incident, plaintiff texted defendant that she loved him and proceeded to meet defendant at a hotel on two other dates.

The next incident of harassment alleged in the TRO occurred on March 29, 2019. Defendant texted plaintiff that they needed to talk and it was serious. Defendant told plaintiff that he had received a "few phone calls" and "need[ed] it all deleted." Two back-to-back phone calls followed, which plaintiff recorded and entered into evidence. On the recordings, defendant asked plaintiff if she ever took any videos of him and stated that "somebody knows about the issue with a weapon." The court found this statement "corroborates [plaintiff's] account of what transpired on January 10 into the early morning hours of January 11 regarding [defendant's] displaying of his firearm."

Defendant told plaintiff that he received phone calls about running her friend's husband's license plate in the past, which he did at plaintiff's request,

5

and stated a number of times that he could lose his job. He repeatedly asked plaintiff how anyone would know information that only the two of them knew. Further into the call, plaintiff and defendant negotiated the deletion of numerous messages from defendant as well as a photograph of plaintiff naked from their Snapchat conversations.

On April 1, 2019, plaintiff's husband called defendant and told him not to call his wife anymore. Two days later, plaintiff revealed the intimate details of her affair to her husband. On that same day, plaintiff learned that the video of defendant taken on January 10, which she sent to her therapist after the incident, had been sent to the therapist's local police department and then forwarded to the Upper Saddle River Police Department. Plaintiff was called to the police station and, after four hours, filed an application for a TRO against defendant. After the TRO was granted, defendant was charged criminally on May 13, 2019.

The court found that harassment occurred and plaintiff's "life, health, [and] well-being have been and are endangered by . . . defendant's acts and that the entry of a[n] [FRO] is necessary for [her] protection."

## II.

A-4753-18T3

Our review of a family court's factual conclusions is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Id. at 413. "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We will "not disturb the 'factual findings and legal conclusions of the trial judge unless [we are] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Ibid. (quoting Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). "On the other hand, where our review addresses questions of law, a 'trial judge's findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles.'" R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015)).

A trial court must conduct a two-part analysis when determining whether to issue an FRO. Silver, 387 N.J. Super. at 125–27. The court must first determine "whether the plaintiff has proven, by a preponderance of the

7

credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. The evidence must be considered "in light of whether there is a previous history of domestic violence, and whether there exists immediate danger to person or property." Id. at 126. Following a finding of the commission of a predicate act, the court must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Id. at 127.

## III.

Defendant argues that the video reveals a flash of light shining on defendant's hand making the alleged gun not visible and, based on the defense expert's testimony, defendant is likely holding his silver cell phone rather than a gun. Further, defendant states that plaintiff could not recall whether defendant's gun was black or silver. He points to defendant's wife's testimony that defendant's handguns are both black.

The court found plaintiff's testimony, which was "at the crux of this matter," to be credible based on her demeanor, her willingness to answer questions, her candidness, and the believability of her testimony. The poor quality of the video does not mean that a firearm was not present in the car.

The audio recording of the January 10 incident and the recording of defendant's later phone call support that a gun was present in the car.

Plaintiff testified that she took the video after he pulled the gun out because she "didn't know if [she] was going to die that night in a car accident or have him shoot himself next to [her]." After listening to plaintiff's testimony and viewing her demeanor throughout the course of the trial, the court determined that plaintiff and her testimony were credible. We defer to the family court's judgment on credibility determinations.

IV.

Defendant also argues that plaintiff "never alleges, and the court does not find, evidence that [d]efendant ever beat, tortured, physical[ly] abused, directly threatened or committed any acts of violence against [p]laintiff." He cites to Peranio v. Peranio, 280 N.J. Super. 47, 55–57 (App. Div. 1995), where we reversed an FRO on the basis that the defendant's conduct, telling plaintiff "I'll bury you," was not enough to warrant protection under the PDVA. We found "absolutely no history of threats, harassment, physical or mental abuse or violence between [the] parties, who were on the threshold of dissolving their marriage when a conflict over property occurred." Id. at 56. That is not the situation here. Our Supreme Court has stated that "[t]he law is clear that

9

acts of actual violence are not required to support a finding of domestic violence." H.E.S. v. J.C.S., 175 N.J. 309, 329 (2003).

The PDVA defines "domestic violence" as requiring a predicate act. N.J.S.A. 2C:25-19(a). There are nineteen predicate acts listed in the PDVA, including harassment. N.J.S.A. 2C:25-19(a)(13). Harassment is defined as when "a person . . . with purpose to harass another . . . [m]akes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm"; "[s]ubjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so"; or "[e]ngages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person." N.J.S.A. 2C:33-4(a), (b), (c).

The court stated:

> The facts as I have found them of the event that occurred on January 10th into the 11th of 2019, I do find support, by a preponderance of the evidence, the elements of harassment. Driving a car – driving in the car recklessly during an argument, threatening self-harm, stating one couldn't live without another, in certain instances, it may be found that one cannot glean the intention as to annoy or alarm the other individual, the plaintiff, the victim in that matter.

Once [defendant] displayed his firearm, I can infer no other intention but that his intention was to alarm [plaintiff]. . . .

. . . .

Now, there are cases that say[] threats to commit suicide don't amount to harassment. When an individual, while threatening to hurt themselves, displays their firearm and is waving it around – there's no allegation that he pointed it at [plaintiff]; there's no allegation that he held it to his head. The only intention that I can find is that his intention was to alarm her. His intention – he didn't use the firearm; it wasn't taken away from him. I infer that his intention was to annoy or alarm.

In making this finding, the court cited to H.E.S. where our Supreme Court stated: "'A finding of purpose to harass may be inferred from the evidence presented' and from common sense and experience." H.E.S., 175 N.J. at 327 (quoting State v. Hoffman, 149 N.J. 564, 577 (1997)).

The trial court found that defendant's suicidal threats combined with pulling out a firearm while speeding down a freeway was enough to constitute the predicate act of harassment. As the court found, the circumstances surrounding the incident point to a purpose to alarm plaintiff. The court also took into account defendant's messages to plaintiff threatening to harm himself and others.

V.

11

When the court finds that a predicate act has been committed, it must then determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. The PDVA lists the six factors to be evaluated, only three of which are relevant here: factor one, "[t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse"; factor two, "[t]he existence of immediate danger to person or property"; and factor four, "[t]he best interests of the victim and any child." N.J.S.A. 2C:25-29(a)(1), (2) and (4).

Our Supreme Court in Cesare found that "not only may one sufficiently egregious action constitute domestic violence under the [PDVA], even with no history of abuse between the parties, but a court may also determine that an ambiguous incident qualifies as prohibited conduct, based on a finding of violence in the parties' past." Cesare, 154 N.J. at 402. Defendant argues that harassment is not a "sufficiently egregious act" to justify the entry of an FRO without the existence of a prior history of domestic violence.

The court discussed instances where defendant threatened harm to plaintiff's husband, threatened harm to himself, and mentioned his aggression

and his power as a police officer. On one occasion, defendant threatened to shoot plaintiff's husband if he ever came to his home. On another occasion, defendant told plaintiff that if her husband drove at him again, he would get "pulled from the car at gunpoint and locked up in front of everyone or shot." Once defendant told plaintiff he reported the license plate of a trainer who had flirted with her at their gym to the local police department so he would be stopped by the police. Another incident occurred on July 3, 2018, where defendant aggressively tried putting his hands down plaintiff's pants after she said no.

## VI.

Defendant argues that the court erred in allowing plaintiff to introduce numerous Snapchat messages sent to her by defendant to show the existence of a prior history of domestic violence. Defendant asserts that the court "essentially allowed [p]laintiff to 'cherry-pick' the pieces of information that she wanted to present in an attempt to paint [d]efendant in a negative light." He argues this violated his due process rights.

Defendant argues this issue of completeness became more apparent once the State turned over discovery in connection with the criminal charges

13

pending against defendant, after the entry of the FRO.[1]  The discovery contained "thousands of messages and communications on plaintiff's phone."

We defer to the evidentiary decisions of the trial court.  State v. Brown, 236 N.J. 497, 521 (2019).  The post-FRO discovery is not before us because it was not before the trial court.  See Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 539 (App. Div. 2009).  The court did not abuse its discretion in carefully reviewing and admitting a selected number of the messages offered by plaintiff.

### VII.

Defendant asserts that N.J.S.A. 2C:25-29(a)(1) "limits the evidence to the domestic violence history between the plaintiff and the defendant," and thus, pursuant to N.J.R.E. 404(a) and (b), defendant's statements about plaintiff's husband, as well as other third parties, should not have been admitted into evidence.

Defendant argues that the court failed to follow State v. Cofield, 127 N.J. 328 (1992), to determine whether evidence of prior bad acts fall within an

---

[1] Defendant made no motion to the trial court for a new trial based on newly discovered evidence, R. 3:20-2, perhaps because he was a party to these conversations and therefore was aware of the substance of the communications.

exception to N.J.R.E. 404(b).  The <u>Cofield</u> test requires the court to analyze four factors when considering evidence of prior bad acts: they must be 1) "admissible as relevant to a material issue"; 2) "similar in kind and reasonably close in time" to the acts alleged; 3) involve "clear and convincing" evidence; and 4) "[t]he probative value of the evidence must not be outweighed by its apparent prejudice." <u>Cofield</u>, 127 N.J. at 338.

Defendant relies on <u>R.G.</u>, where we explained that "[a]lthough N.J.S.A. 2C:25–29(a)(1) permits the introduction of evidence of the 'previous history of domestic violence,' it does not authorize introduction of evidence regarding a defendant's past altercations with others." <u>Id.</u> at 222. Here, the threats were communicated directly to plaintiff, not her husband. Such threats to assault her husband accentuated the alarm engendered by defendant's other threatening behavior.

Defendant also cites to <u>D.C. v. T.H.</u>, 269 N.J. Super. 458, 461–62 (App. Div. 1994), where we found the defendant's alleged harassing statement concerning the plaintiff's boyfriend's use of corporal punishment on the defendant's child was directed at the boyfriend, not plaintiff, and no intent to harass the plaintiff was found by the court. We also determined that plaintiff's proofs did "not establish or even suggest that defendant was engaged in a

course of alarming conduct or repeatedly committed any acts with the purpose to alarm or seriously annoy plaintiff." Id. at 462. Here the court found to the contrary.

When viewing defendant's statements threatening harm to plaintiff's husband in light of the January 10 incident and the totality of the circumstances, the court found that an FRO was necessary to protect plaintiff. The court stated:

> [Defendant's] text messages are peppered with these references to aggression, not only self-harm but harm to others, harm to [plaintiff's husband.]
>
> He has referenced to her in conversations the things he has the ability to do as a police officer: run license plates, call building inspectors, contact child welfare agencies. This is . . . an underlying theme. He also reminds her that he can't get in trouble. I do believe that this is a pattern, and I do believe that this is a pattern in which or a lens through which one must view what transpired on January 10[] and 11[] . . . .
>
> . . . .
>
> And when I view the totality of the circumstances, I find by a preponderance of the evidence, that the plaintiff's life, health, [and] well-being have been and are endangered by the defendant's acts and that the entry of a[n] [FRO] is necessary for . . . plaintiff's protection.

## VIII.

16

A-4753-18T3

Defendant asserts that the court failed to address the fact that plaintiff applied for a TRO on April 3 based on a predicate act that occurred in January, after which plaintiff voluntarily went to a hotel with defendant on January 16 and continued her affair with defendant until the end of March.

Following the playback of the March 29 phone call in court, plaintiff was asked why she did not end the conversation with defendant or tell him to stop bothering her. She responded: "I would never say that, because I felt like if I did say that it would make him explode. So I always tried to like slowly distance myself or maybe not see him as often or not talk as often." When asked what she meant by explode, she responded:

> [T]hreaten to kill himself again, threaten to hurt my husband, tell me, you know, he's not going to let me walk away from him. Things he's said in the past. I didn't know if he would come to where I was at the gym or my house or my kids' school or -- I don't know. I just wanted to try to appease him, I guess. So . . . I would never just say just don't talk - I had said that in the past, like the night January 10th to the 11th. I told him it was over. And then, of course, what happened, so I didn't want another night like that. I just – I just was trying to, you know, I guess be soft about it.

The court found that while the January 10 incident was a sufficiently egregious act to warrant an FRO by itself, the other incidents showed a pattern of behavior further supporting the entry of an FRO against defendant. When

17

asked if she feared for her safety, plaintiff responded: "Yes I do." Plaintiff credibly expressed fear for her safety based on defendant's behavior, which reflected an inability to control his aggression. The court did not abuse its discretion. Its findings were supported by substantial credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4753-18T3