# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4395-19

A.M.D.,

     Plaintiff-Respondent,

v.

K.E.F.,

     Defendant-Appellant.

_____

K.E.F.,

     Plaintiff-Appellant,

v.

A.M.D.,

     Defendant-Respondent.

_____

     Argued April 12, 2021 – Decided May 24, 2021

     Before Judges Rothstadt and Mayer.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket Nos. FV-07-1938-20 and FV-07-1977-20.

Steven M. Resnick argued the cause for appellant (Ziegler, Resnick & Epstein, attorneys; Steven M. Resnick and Jonathan H. Blonstein, on the briefs).

Andrew M. Shaw argued the cause for respondent (Shaw Divorce & Family Law LLC, attorneys; Andrew M. Shaw, on the brief).

PER CURIAM

Defendant, K.E.F. (Kevin),[1] appeals from a June 26, 2020 final restraining order (FRO) entered in favor of plaintiff, A.M.D. (Amanda), under the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, and from a July 24, 2020 order awarding counsel fees and costs to Amanda. We affirm.

The facts derived from the record are summarized as follows. The parties began dating in 2013 and had a daughter approximately one year later. The parties' domestic violence complaints in the instant matter arose from an incident in December 2019 and, on other earlier occasions, each had previously filed domestic violence complaints against the other.

In January 2016, Amanda applied for and obtained a temporary restraining order (TRO) against Kevin alleging that he committed the predicate act of

---

[1] We use pseudonyms to protect the identity of victims of domestic violence and to preserve the confidentiality of these proceedings. R. 1:38-3(d)(9) to (10).

harassment when he showed up at her home, verbally berated her, and threatened her brother. Two days later, Kevin sought and obtained a TRO against Amanda premised upon allegations of harassment and assault arising out of the same incident. However, they dismissed their complaints and in August 2016, they entered into a consent order for civil restraints barring future acts of harassment and imposing automatic monetary penalties as a deterrence.

On December 18, 2019, Amanda applied for a TRO, alleging that on December 17, Kevin committed the predicate act of assault when he "purposely and knowingly threw a glass bottle at [her] while she met with him to exchange custody of their daughter." Her complaint also set forth past events of domestic violence, specifically a "prior [domestic violence] history going back . . . four years," an "incident [i]n June of 2018 with property damages by [Kevin]," an incident in "June of 2019 where [Kevin] pushed [Amanda] against the wall," and "three prior [domestic violence complaints] during 2016 that were dismissed." Once again, Kevin likewise sought and obtained a TRO against Amanda alleging she committed the predicate act of harassment when she allegedly kicked him earlier on the evening of December 17.

Following the incidents on December 17, 2019, both parties filed criminal complaints against the other. On February 19, 2020, the parties appeared in

municipal court and mutually dismissed the criminal charges. During the judge's colloquy with Amanda to verify that her dismissal of the charges was voluntary, the judge asked her whether she was in fear of Kevin, to which Amanda, after pausing, responded, "No." When the judge asked Amanda why she had paused, she responded, "We have a restraining order."

Judge L. Grace Spencer conducted a three-day trial as to the parties' cross-complaints for FROs. At trial, the judge heard testimony from the parties regarding the history of their relationship and the events that precipitated the parties' complaints. She also heard testimony from Officer Briana Geppetti from the Montclair Police Department and from one of Kevin's employees.

Amanda testified that Kevin had a history of harassing her. She stated that Kevin began sending her harassing messages six months into their relationship, and this conduct persisted at least up to the entry of her most recent TRO. In support of her claims, she produced a voluminous collection of text messages exchanged between the two, and these messages were admitted into evidence without objection. Although some of the conversations between the pair were amicable, Kevin's messages to Amanda often devolved into expletive-laced name-calling upon little to no provocation.

A-4395-19

Additionally, Kevin's more recent texts to Amanda sometimes adopted a threatening tone. At one point, regarding who would be responsible for picking up their daughter from a park, Kevin texted Amanda, "I promise you I won't be there and if [she] gets left there I [will] kill you[.] I'm done playing." He continued, "I will smack the shit out of you if you leave her there," and "I'm gonna smack you're [sic] fucking teeth out your mouth." On another occasion, after Amanda messaged Kevin saying they were "not cool and [would] never be cool again," he texted her saying, "If you block me or disrespect me by not answering I will make you pay for it[.] . . . We will see who breaks first now." When questioned about the statements contained in the text messages, Kevin did not deny the interactions occurred. Instead, he suggested these interactions were "things that occur in normal relationships."

Amanda also testified about an incident that occurred in her apartment in or around June 2018 after Kevin, who was present at the apartment, had accessed her Facebook account and had seen messages sent to her from a male friend. She testified that when she returned home from work, Kevin angrily took her backpack containing her work laptop and threw it against a wall, creating a large hole in the wall. In addition, she produced a photograph of the hole, which

5

Judge Spencer described as "[two] feet wide" and noted that "the wall is broken into three parts—two parts of the dry wall are cracked and barely hanging on."

Kevin also testified as to this event. According to him, the two were living together at the time, and he was upset by seeing the messages on her computer because he thought he and Amanda were dating again. He stated that upon Amanda's return to the apartment, they began arguing immediately and she threw her backpack at him. He testified that he then deflected the bag into the wall, which caused the hole depicted in the photograph plaintiff had produced.

As to the events of December 17 that precipitated Amanda's current domestic violence complaint, the parties provided conflicting accounts. Amanda testified that she had been delayed in picking up their daughter, and that, upon arriving, she could tell Kevin was angry. According to Amanda, upon retrieving her daughter from Kevin, she retreated to her vehicle out of fear. She testified that Kevin then got in his vehicle, pulled up next to hers, and demanded she roll down her window, but she fled in her car. Kevin followed her, and at one point, tried to block her vehicle's progress by maneuvering his car in front of hers perpendicularly, before eventually pulling up beside her vehicle when she had stopped and shouting "open the fucking window." Amanda testified that when she rolled down her window, Kevin threw the water bottle at her, striking

6

her in the forehead, and shouted "when I tell you to lower your fucking window, you better lower your fucking window" before driving away. When asked whether it was possible that Kevin intended she catch the water bottle, Amanda responded, "No. Absolutely not."

Amanda produced photographs of her injury, which were admitted into evidence without objection, and which she took immediately following the bottle incident and the day after. The photographs depicted swelling and bruising to her forehead where she was allegedly struck with the bottle. When asked about her injury, Amanda testified that the bump on her forehead "looked like a golf ball" and "really hurt."

In further support of her allegations, Amanda called Officer Geppetti who testified that Amanda had appeared at the Montclair Police Department on the evening of the water bottle incident bearing "signs of injury and domestic violence." She also testified that she had assisted Amanda in filing a police report concerning the incident with the bottle and had taken the photographs of Amanda's injury that were included in the police report.

Kevin's version of the incident differed significantly. He testified that, despite Amanda's obligation to pick up their daughter on that night, she refused to retrieve their daughter from his home unless he paid her money that she

7

claimed he owed her. Upon her arrival at his home, Amanda immediately demanded money. Kevin handed her their daughter but refused her demands for money, stating that she would need to take him back to court if she wanted additional funds from him. Then, when he tried to close the door, Amanda stuck her foot in the door and kicked him in the shin before leaving the home.

Kevin then testified that approximately ten minutes after Amanda had left his home, he retrieved money from his mother and left for the gym. On his way to the gym, he saw Amanda pulled over on the side of the road attempting to flag him down. He pulled over and, when he did so, Amanda demanded he give her their daughter's water bottle. He testified that he then tossed the water bottle to Amanda, but she failed to catch it before it fell to the ground. Kevin stated that he did not see the bottle hit her, and he then drove away with no further contact.

In support of his allegations, Kevin called an employee and longtime friend, who testified that a few days after the December 17 incidents, he and Kevin decided to head to a park after work. While in route to the park, they passed the location where Kevin tossed the bottle, whereupon they spotted the bottle on the ground and retrieved it.

A-4395-19

On June 26, 2020, Judge Spencer granted Amanda's FRO, dismissed Kevin's TRO, and placed her reasons on the record. After summarizing the parties' testimony regarding their relationship, past interactions, and the events that occurred on December 17, 2019, she made detailed findings as to the parties' credibility. She first found that Kevin was not credible, stating he had not conducted himself properly during the trial, was evasive when answering questions, and did not appear engaged with the proceedings. She highlighted Kevin's testimony regarding the backpack incident, determining that, based on the "magnitude," "depth," and "height of the hole," Kevin's testimony that he "mere[ly] flick[ed the] bag to the side" was not credible. Further, she noted there were inconsistencies between Kevin's allegations in his complaint and his testimony at trial and that Kevin's version of events on December 17 did not "comport with the timeline" when considered against the timestamps on the parties' text messages from that evening. Conversely, she found Amanda's description of events "more plausible" and that her testimony, supported by the evidence she had produced, was "more reliable." Accordingly, the judge accepted Amanda's account of the events.

Addressing whether Amanda had proved a predicate act, Judge Spencer determined that Amanda had established by a "preponderance of the credible

9

evidence that . . . [Kevin] committed [the] domestic violence offense of assault" pursuant to N.J.S.A. 2C:12-1 and had "met the first prong of <u>Silver</u>.[2]" She stated that "a person commits . . . simple assault . . . if they attempt to or purposely and knowingly cause[] bodily injury to another, or put[] the person in reasonable fear of bodily harm." She stated, "[Amanda] testified that [Kevin] threw a water bottle at her, and I believe it." She noted that the bottle that was thrown was a "hard plastic" of a kind that "does not break easily." She also reviewed the photographs Amanda produced of her injuries, noting that there was "redness to [Amanda's] forehead," that "the coloring is off," and that there was a "red line . . . about a half-inch to an inch long" where Amanda alleged the bottle struck her.

Judge Spencer determined that Amanda had established that an FRO was "necessary to protect [her] from an immediate danger or to prevent further abuse." In reaching that determination, she considered the six factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6). She first found that there was a prior history of domestic violence, "both reported and unreported" based on the expansive collection of harassing communications Kevin sent to Amanda and the criminal charges against Kevin which Amanda had voluntarily dismissed.

---

[2] <u>Silver v. Silver</u>, 387 N.J. Super. 112 (App. Div. 2006).

She then found that there was an immediate danger to Amanda based upon Kevin's recurrent "psychological bombardment of name-calling."

The judge also considered the relative financial circumstances of the parties, finding that Kevin, who had often represented himself as being in a superior financial position to Amanda, had refused to pay Amanda pursuant to a support agreement "as a means of controlling [her] behavior." She then found that the "best interest of the victim" weighed in favor of granting an FRO, recounting the throwing of the bottle and the incident wherein Kevin had thrown a backpack at the wall and noting that the parties' daughter was present for both.

The judge also noted that there had been an escalation in Kevin's behavior, demonstrated by the throwing of the bottle, such that there were "concerns about [Amanda's] safety when it comes to parenting time and visitation." Finally, she determined that Kevin had acted with "a desire to abuse or control" Amanda, highlighting Kevin's frequent insults denigrating Amanda's weight and appearance, his threats of violence, and the fact that when Amanda responded calmly "it only seem[ed] to infuriate [Kevin] more."

Judge Spencer entered an FRO in favor of Amanda[3] and, on July 24, 2020, she entered another order granting Amanda $19,250 in counsel fees and costs as compensatory damages pursuant to N.J.S.A. 2C:25-29(b)(4). This appeal followed.

Our review of a Family Part court's granting of an FRO is limited. "We accord 'great deference to discretionary decisions of Family Part judges'" given "the 'family courts' special jurisdiction and expertise in family matters.'" G.M. v. C.V., 453 N.J. Super. 1, 11 (App. Div. 2018) (first quoting Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012); and then quoting N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010)). When reviewing "a trial court's order entered following trial in a domestic violence matter, we grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We will "not disturb the 'factual findings and legal conclusions of the trial [court] unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare v. Cesare, 154

---

[3] Judge Spencer also dismissed Kevin's complaint, concluding there was nothing in the record to support a finding that Amanda kicked him with the intention to harass. He did not appeal from the dismissal of his complaint.

N.J. 394, 412 (1998) (quoting Rova Farms Resort, Inc. v. Invs. Ins. of Am., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate when the evidence is testimonial and involves credibility issues because the trial court who observes the witnesses and hears the testimony has a perspective that the reviewing court does not enjoy. Cesare, 154 N.J. at 412; Pascale v. Pascale, 113 N.J. 20, 33 (1988).

"On the other hand, where our review addresses questions of law, a 'trial [court's] findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles.'" R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 434 (App. Div. 2002)).

In determining whether to issue an FRO, a court first must determine whether the plaintiff has established, "by a preponderance of the credible evidence, that" the defendant has committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a). Silver, 387 N.J. Super. at 125. The PDVA "defines domestic violence by referring to a list of predicate [offenses] . . . found within the New Jersey" Criminal Code. J.D. v. M.D.F., 207 N.J. 458, 473 (2011). "[T]he commission of a predicate act . . . constitutes domestic violence . . . ." Ibid.

Assault is one of the delineated criminal offenses under the PDVA. N.J.S.A. 2C:25-19(a)(2). A person is guilty of simple assault where, they "purposely, knowingly or recklessly cause[] bodily injury to another"; "[n]egligently cause[] bodily injury to another with a deadly weapon"; or "[a]ttempt[] by physical menace to put another in fear of imminent serious bodily injury." N.J.S.A. 2C:12-1(a). "Bodily injury" is defined as "physical pain, illness or any impairment of physical condition." N.J.S.A. 2C:11-1(a). "Not much is required to show bodily injury. For example, the stinging sensation caused by a slap is adequate to support an assault." State v. Stull, 403 N.J. Super. 501, 505 (App. Div. 2008) (quoting N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997)).

If the court determines a plaintiff established, by a preponderance of the evidence, that a defendant committed a predicate act of domestic violence as defined in N.J.S.A. 2C:25-19(a), it must then consider the factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6)[4] to determine whether an FRO is necessary "to

---

[4] The six, non-exclusive factors include:

> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 125-27; see also A.M.C. v. P.B., 447 N.J. Super. 402, 414 (App. Div. 2016). "Commission of a predicate act is necessary, but alone insufficient, to trigger relief provided by the [PDVA]." R.G., 449 N.J. Super. at 228. Although that determination "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29[(a)](1) to -29[(a)](6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. This "second prong set forth in Silver requires [that] the conduct [be] imbued by a desire to abuse or control the victim." R.G., 449 N.J.

---

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety; and

(6) The existence of a verifiable order of protection from another jurisdiction.

[N.J.S.A. 2C:25-29(a)(1) to (6).]

Super. at 228 (citing Silver, 387 N.J. Super. at 126-27); see also Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995) (defining domestic violence as "a pattern of abusive and controlling behavior injurious to its victims").

Whether a defendant's conduct was designed to abuse or control the plaintiff should be assessed in the context of the "entire relationship between the parties." Cesare, 154 N.J. at 405. The court may also look to other relevant factors not included in the statute. N.J.S.A. 2C:25-29(a); N.T.B. v. D.D.B., 442 N.J. Super. 205, 223 (App. Div. 2015) (noting the statutory factors are "nonexclusive").

Whether a plaintiff has established an act of domestic violence had occurred is not determined in a vacuum. As we have stated:

> The law mandates that acts claimed by a plaintiff to be domestic violence must be evaluated in light of the previous history of domestic violence between the plaintiff and defendant including previous threats, harassment and physical abuse and in light of whether immediate danger to the person or property is present. N.J.S.A. 2C:25-29(a)(1) and (2). This requirement reflects the reality that domestic violence is ordinarily more than an isolated aberrant act and incorporates the legislative intent to provide a vehicle to protect victims whose safety is threatened. This is the backdrop on which [a] defendant's acts must be evaluated.
>
> [R.G., 449 N.J. Super. at 228-29 (quoting Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995)).]

With these guiding principles in mind, we turn to Kevin's contentions on appeal. He first argues that the record did not support Judge Spencer's findings that a predicate act of domestic violence occurred. Specifically, he argues that Judge Spencer failed to make a finding that he threw the bottle with the intent or purpose to hit Amanda or that the bottle inflicted bodily harm and that Amanda failed to establish that the predicate act of assault occurred by a preponderance of the evidence. He also argues that Judge Spencer erred in considering the history of harassment between the parties because "harassment" was not the predicate act alleged and that there was no basis to find that he committed assault because the child's bottle thrown was not a "deadly weapon" and there was no testimony, nor any finding, that Kevin attempted by physical menace to put plaintiff in fear of imminent serious bodily injury.

Kevin also argues that the judge erred in finding that Amanda required an FRO to prevent "immediate danger or further acts of domestic violence" because Amanda was not afraid of him and because Judge Spencer did not sufficiently connect the past harassment to the predicate act of assault. Finally, he argues that, because Judge Spencer erred in her grant of an FRO, she also erred in compelling him to pay Amanda's counsel's fees.

17

Having considered Kevin's arguments in light of the record and the applicable principles of law, we affirm.

We first address Kevin's assertion that Judge Spencer erred in determining that he committed the predicate act of simple assault on December 17, 2019. In reaching that conclusion, Judge Spencer recounted the parties' testimony regarding the December 17 incident—including Amanda's testimony that Kevin was angry, had intentionally thrown the bottle, that the bottle had hit and injured her, and that Kevin did not intend her to catch the bottle. In addition, Officer Geppetti also testified regarding the incident and the photographs taken that evening contained in her police report, and Judge Spencer reviewed the photographs of Amanda's injuries in detail. In consideration of that evidence, Judge Spencer concluded that Kevin intended to throw the bottle and that, in throwing it, he caused Amanda to be injured.

We are not persuaded by Kevin's argument that the judge's determination was deficient for failure to expressly find he "threw the bottle with the intent or with the purpose to cause bodily harm." To the contrary, Judge Spencer expressly adopted Amanda's testimony as to the throwing of the bottle, stating that Kevin "chucked it at her head" and that "it was not tossed with the intent that she would catch it."

A-4395-19

Amanda's testimony that Kevin forcefully threw the bottle at her head was sufficient to support a reasonable inference that Kevin acted knowingly, that is, he was aware that it was "practically certain that his conduct" would cause bodily injury.  N.J.S.A. 2C:2-2(b)(2).  In any event, at minimum, the evidence was sufficient to show he acted recklessly by "consciously disregard[ing] a substantial and unjustifiable risk" that bodily injury would result from his throwing the bottle at Amanda's head, in "a gross deviation from the standard of conduct that a reasonable person would observe in [that] situation."  N.J.S.A. 2C:2-2(b)(3).  According Judge Spencer's credibility determinations due deference, Cesare, 154 N.J. at 412, her finding that Kevin committed the predicate act of assault was supported by sufficient evidence in the record.

We next turn to Kevin's arguments that Judge Spencer erred in finding that Amanda needed an FRO to protect her from "immediate danger or further acts of domestic violence."  On appeal, Kevin argues that Judge Spencer erred in entering the FRO "in essence" because Amanda did not prove she was in fear of Kevin and because there was an insufficient connection between the history of harassment and the predicate offense of assault.  We disagree.

Nothing in the PDVA precludes a finding that an FRO is necessary to prevent future abuse absent an explicit expression that the plaintiff lived in fear

of the perpetrator. See N.J.S.A. 2C:25-17 to -35. Notably, "whether the victim fears the defendant" is one of eleven non-exclusive factors the trial court considers upon an application to modify or dissolve an existing FRO. G.M., 453 N.J. Super. at 13 (citing Carfagno v. Carfagno, 288 N.J. Super. 424, 435 (Ch. Div. 1994)). That said, even in that context, although important, whether the plaintiff fears the defendant is only one factor in—not the end of—the court's analysis. Ibid.

Additionally, although it is often the case, when determining whether an FRO is necessary, there is no requirement that the act predicating the request for the FRO be of the same kind or type as past acts of domestic violence. To the contrary, the trial court is expressly called upon to consider all of the parties' relevant history. See N.J.S.A. 2C:25-29(a)(1) ("The court shall consider . . . [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse." (emphasis added)).

Here, based on the credible testimony, Judge Spencer examined the six factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (6) and determined that an FRO was necessary to protect Amanda. She appropriately considered the history of harassment—describing Kevin's frequent denigrating and threatening text messages to Amanda as a "psychological bombardment." She also found

Kevin's behavior to be "escalating," pointing to the incident in which he threw Amanda's backpack against the wall in 2018 and the thrown bottle on December 17, 2019. Finally, she found that Kevin's actions were motivated by "a desire to abuse or control" Amanda as required under the second prong of Silver. Notably, Judge Spencer found it "alarming" that Kevin "did not think that there was a problem with his behavior, which suggest[ed] . . . that such behavior would only continue." Based on this record, we are satisfied the FRO was necessary to protect Amanda from further abuse, and there was sufficient evidence to support the judge's findings under both Silver prongs.

Last, Kevin argues that if this court vacates the FRO entered in Amanda's favor, it should also vacate her statutory award of counsel fees. Because we find no error in Judge Spencer's entry of the FRO, we likewise discern no error in the subsequent grant of attorney's fees.

To the extent we have not specifically addressed any of Kevin's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-4395-19