# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0731-19

S.M.B.,

    Plaintiff-Respondent,

v.

M.F.B.,

    Defendant-Appellant.

_____

Submitted October 25, 2021 – Decided November 17, 2021

Before Judges Messano and Accurso.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Burlington County, Docket No. FV-03-0217-20.

Charny Karpousis Altieri & Donoian, PA, attorneys for appellant (Melissa Y. Hoffman Spears, on the briefs).

Rutgers Domestic Violence Clinic, Rutgers Law, attorneys for respondent (Denise Higgins, Staff Attorney, of counsel; Hannah Lee, admitted pursuant to Rule 1:21-3(b), on the brief).

PER CURIAM

Defendant M.F.B. appeals from a final restraining order entered against him pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, based on the predicate act of harassment, N.J.S.A. 2C:33-4. See N.J.S.A. 2C:25-19(a)(13). He contends the evidence failed to establish harassment or that plaintiff, his ex-wife S.M.B., needs the protection the order provides. Having reviewed the record, we cannot agree on either point and thus affirm entry of the restraining order.

The parties had been married for fourteen years when their relationship foundered, largely over finances and differences in parenting their three children, all young adolescents. Plaintiff testified defendant had trouble controlling his anger toward her and their children, resulting in his often yelling at them and occasionally throwing things, such as homework or a schoolbook.

According to plaintiff, defendant could, on occasion, get so worked up he would shove, slap or choke her. She testified she turned to defendant's parents for help, hoping they could "[s]it down and talk with him and us all work out how he can get himself some help." She claimed the intervention went badly after defendant "blew up, and he lost his mind by yelling and screaming," saying it was all her fault and "how dare [she] involve his

2

parents." When plaintiff told him she wanted a divorce, defendant threatened to kill her, telling her he wanted to rip out her eyes and rip off her ears, and that he would dig a hole and bury her in it and no one would find her.

Although she had called the police on one occasion a few years earlier, plaintiff sought a restraining order only after the parties had been separated for almost a year. She testified defendant called her at work over money he believed was missing from their joint checking account. He said he was coming over and demanded she give him cash. Plaintiff testified she told him she didn't have the money and pleaded with him not to come to the dentist's office where she worked as a receptionist, as she did not want to lose her job. Defendant came anyway, yelling and throwing bank statements at her, as well as pens and items he found on her desk. After asking him to please be quiet, she walked into the parking lot so they could talk privately.

Although plaintiff testified she repeatedly asked defendant "please don't do this," as she was "going to lose [her] job," she claimed he was "in [her] face," following her as she continued to back away from him. As they went around the back of the building, defendant kicked her car and punched her car window while continuing to scream at her. When the dentist came to her aid at the back door, defendant told him to shut the door, that this was "none of [his]

business," and had "nothing to do with him." When defendant was distracted by a passing truck, plaintiff broke away from him and ran inside, locking the door. She managed to get the front door locked before defendant came around the building, but that did not stop him from kicking the door and banging on it to get in.

Plaintiff did not pursue a final restraining order after that incident. Instead, the parties, with assistance from their divorce lawyers, agreed to the entry of civil restraints. The order barred defendant from plaintiff's office, and the parties agreed they would only contact one another through My Family Wizard, and only about the children and "marital bills." Plaintiff testified that within weeks, however, defendant had violated its terms, screaming at her when she dropped off their son for parenting time that she had "ruined [their] family," was "separating everyone," and that he wanted them to "stay together and work things out."

Plaintiff filed a police report but did not immediately seek a new temporary restraining order, notwithstanding that defendant had repeatedly texted and called her about their relationship and not wanting the divorce.[1]

_____

[1] The parties were communicating about the children through texts as they had not established a My Family Wizard account because plaintiff claimed she

A-0731-19

Plaintiff only sought a new restraining order after she listened to a voice mail message from defendant on their ten-year-old's phone, three-weeks after she had dismissed her temporary restraining order in favor of civil restraints. The "message" was not actually a message at all, but a recording of an angry argument between defendant and his parents, in which defendant could be heard shouting that he would kill plaintiff, cut off her legs and leave the country with the children. Plaintiff testified she feared defendant and believed his harassment of her would not stop without entry of a final restraining order.

Defendant and his mother also testified at the hearing. Defendant testified he had never shoved, slapped or choked plaintiff, and that none of the incidents she testified to had ever happened. He did admit going to her office because he "wanted to show her the bank statements," but claimed he was "completely calm," when he "took the paperwork [and] threw it on the floor." Defendant also admitted telling plaintiff's boss "to mind his business and go in," when the dentist went to the back door after "he probably heard [their] conversation inside," although defendant denied ever yelling at plaintiff. Defendant further admitted going around to the front door after plaintiff ran

could not afford the cost. Plaintiff testified that in addition to texting about the children, however, defendant also contacted her about wanting to get back together.

inside, but claimed that after turning the doorknob and finding it locked, he knocked only one time before retreating to his truck.

As for the voice mail message left on their son's cell phone, defendant testified he'd come back from taking his son home early during his parenting time and was "aggravated, frustrated, [and] upset." After leaving his phone on the kitchen counter of his parents' home where he was staying, he walked into the living room where his mother told him that plaintiff "really knows how to push your buttons." He testified he responded by asking "is that something to be proud of?" He testified he told his mother, he "could do this too" and then foolishly "said all these things that were heard" in the recording "that [he] would never do and — and that was the conversation."

Defendant testified he didn't deliberately dial his son and leave that message when plaintiff was "already destroying our relationship, you know, and destroying them at this point." He claimed he must have inadvertently pressed his son's contact entry when he put the phone down on the counter. Asked by his counsel what was his intention in arguing with his parents, defendant responded "[t]o prove to my mom that just because [plaintiff's] able to push my buttons, doesn't make it right." Asked what he intended by saying he would kidnap his children, defendant explained he was trying to "prove to

[plaintiff] that — metaphorically, it's compared to what she's doing to me, and what she's been doing and why we got divorced and why I filed for divorce." Asked how the conversation with his parents ended, defendant said it ended with him "saying well, guess what, that whole conversation got recorded." Defendant testified he walked into the kitchen, saw his son's name on the phone and his "heart sunk." He said he "hit the end button and . . . waited for the consequences."

Defendant's mother testified the recorded argument started after defendant saw how upset and frustrated they were over not seeing the children. According to her, defendant "was beside himself because he didn't get the time to spend with his son" and "said something inappropriately," which "he didn't mean . . . literally." She explained that when she told him he "can't let [plaintiff] press your buttons. . . . [H]e said, 'pressing my buttons? I'd like to cut her legs [off].'" Defendant's mother testified she knew her son "would never do that. He was just extremely, extremely frustrated."

Defendant's mother explained that defendant sounded loud on the message because "first of all, the television was full blast because [her] husband has a hearing problem, and we were — [defendant] was standing right by the TV, and we were in the living room." Asked on cross-examination

A-0731-19

whether her son had "an anger management issue," she testified "he yells too much at times. Yeah." Asked whether she had "ever seen him angry and hit anything," defendant's mother responded, "No. Yeah, no. Not — no." Asked whether he'd ever hit a wall, she admitted "yeah, there was a time" at his house, and she "yelled at him for that."

After hearing the testimony, the judge found defendant had harassed plaintiff, and that she needed the protection of a final restraining order. The judge found plaintiff a credible witness, explaining her testimony was reasonable, simply relating events and not searching for answers. He found defendant, however, not believable, finding it impossible to square defendant's account of himself, particularly as to his calmly going to plaintiff's office to discuss their joint bank account balance, with the rage in his voice in the recording left on his son's phone.[2] Comparing what defendant said in that message, and the manner in which he said it, with his testimony at trial, the judge was convinced plaintiff had testified truthfully about defendant's prior acts of domestic violence.

---

[2] Although acknowledging he found defendant's mother "for the most part credible," albeit biased in favor of her son, the judge noted he didn't hear a TV in the background of the recording, which was the witness's explanation for why defendant sounded so loud even though the phone was in the kitchen and they were in the living room, two rooms away.

A-0731-19

The judge found defendant's angry communications with plaintiff when she dropped off their son and the text messages he sent her about not wanting the divorce and "winning her back," which texts were admitted into evidence, constituted harassment. Relying on the order for civil restraints, which limited the parties' communication to their children and bills, the judge found defendant knew he should not be communicating with plaintiff about their relationship, was aware his communications were unwanted and annoying to plaintiff, and yet he persisted in his efforts to contact her. The judge found those acts were not only a violation of the order but manifested a purpose on defendant's part to harass plaintiff.

The judge had no hesitation in finding plaintiff needed the protection of a final order. Besides noting defendant's "very disturbing" threats to plaintiff, the judge found the couple's prior history and defendant's willingness to violate a consensual order for civil restraints, made clear "these actions would continue" if a final restraining order were not in place.

Defendant appeals, arguing the court erred in entering a final restraining order based on the violation of a consent order for civil restraints "[w]ithout any credible evidence of a prior history of domestic violence," ruling "the demeanor of a 45 second voice mail message that was not intended for anyone

9

to hear, was more credible than the man that sat before him for hours during trial and thereby justified protecting the plaintiff from further such 'abuse.'"

Our review of a trial court's factual findings is limited. Cesare v. Cesare, 154 N.J. 394, 411 (1998). Findings by the trial court "are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 412 (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). Deference is especially appropriate in a case, such as this one, in which the evidence is largely testimonial and involves questions of credibility because the trial court's ability to see and hear the witnesses provides it a better perspective than a reviewing court to judge their veracity. Ibid.

A final restraining order may issue only if the judge finds the parties have a relationship bringing the complained of conduct within the Act, N.J.S.A. 2C:25-19(d); the defendant committed an act designated as domestic violence, N.J.S.A. 2C:25-19(a); and the "restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006) (noting once the jurisdictional prerequisites have been met, the judge's task is two-fold; first to determine whether plaintiff proved a predicate act, and, if so, whether a final

restraining order is necessary to protect the victim from immediate danger or to prevent further abuse).

Applying those standards here, we find defendant has provided us no basis on which we could upset the factual findings or legal conclusions of the trial court. Both parties testified at some length. The judge had ample opportunity to judge their credibility and obviously found defendant's wanting for reasons the judge explained. The rage with which defendant, in an unguarded moment, expressed his desire to maim and kill plaintiff and kidnap their children corroborated plaintiff's account of how defendant had raged at her over several years, including her description of a prior threat defendant made to kill her in similarly graphic terms. The judge was free to find those "45 seconds" more telling of defendant's character and his behavior toward plaintiff than the picture he attempted to present to the court in his testimony at the domestic violence trial.

Although defendant contends the court's finding that he harassed plaintiff was improperly based only on a violation of a consent order for civil restraints, see N.B. v. S.K., 435 N.J. Super. 298, 305 (App. Div. 2014), that is obviously not so. The judge simply inferred defendant acted with a purpose to harass plaintiff by his yelling at her during parenting exchanges and sending

11

her multiple texts unrelated to the children, because he was on notice by virtue of the dismissal of the temporary restraining order in favor of the order for civil restraints that his conduct was unwelcome and both alarming and annoying to plaintiff, making clear his conscious object was to do just that. See State v. Hoffman, 149 N.J. 564, 577 (1997) (noting a finding of a purpose to harass may be inferred from the evidence, informed by common sense and experience).

Although the trial court should have specified the section of the harassment statute on which he relied, we are satisfied the evidence the judge found credible would support a finding of harassment under N.J.S.A. 2C:33-4(a), "makes . . . communications in . . . any other manner likely to cause annoyance or alarm;" or 2C:33-4(c), "engages in any other course . . . of repeatedly committed acts with purpose to alarm or seriously annoy such other person" in light of the parties' prior history and the totality of the surrounding circumstances. See N.B., 435 N.J. Super. at 304-07 (App. Div. 2014) (discussing "the importance of the context or setting in which the act or acts of harassment occurred" in determining whether conduct constituted harassment).

We are convinced by plaintiff's long delay in seeking a restraining order that there is no basis for defendant's claim that she was attempting to use the

12

order as a sword against defendant in the divorce instead of a shield against his continued harassment.  See J.D. v. M.D.F., 207 N.J. 458, 487 (2011) (cautioning courts to be "especially vigilant" in evaluating claims of harassment in cases involving the interactions of a couple "in the midst of a breakup").  The trial court was correct to reject defendant's claim that his repeatedly alarming conduct was no more than "ordinary domestic contretemps." Peranio v. Peranio, 280 N.J. Super. 47, 57 (App. Div. 1995).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

13                                                    A-0731-19