# RECORD IMPOUNDED

---

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

---

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0374-23

I.T.,[1]

    Plaintiff-Respondent,

v.

G.B.,

    Defendant-Appellant.

_____

> Submitted December 5, 2024 – Decided December 20, 2024
>
> Before Judges Walcott-Henderson and Vinci.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FV-02-0156-24.
>
> Leopold Law, LLC, attorneys for appellant (Howard B. Leopold, on the briefs).
>
> Moskowitz Law Group, LLC, attorneys for respondent (Genevieve Blazini, on the brief).

PER CURIAM

---

[1] We utilize initials to protect the confidentiality of the parties. R. 1:38-3(d)(9).

Defendant G.B. appeals from the August 24, 2023 final restraining order (FRO) entered against him and in favor of plaintiff I.T. pursuant to the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35 (PDVA). Following our review of the record and applicable legal principles, we affirm.

The parties are married and have one sixteen-year-old son. On July 18, 2023, plaintiff filed a domestic violence complaint alleging harassment and was granted a temporary restraining order (TRO). On August 8 and 21, the TRO was amended to also allege assault, terroristic threats, and contempt of a domestic violence order. On August 24, 2023, the court conducted a trial on plaintiff's application for an FRO. Plaintiff, who was represented by counsel, and defendant, pro se, testified at trial.

Plaintiff testified that on July 14, 2023, she caused a complaint for divorce to be served on defendant at the home they shared with their son. She was at work at the time and received a text message from defendant telling her to "come home, pick up [her] stuff[,] and leave the house." Plaintiff then texted with their son who told her he was the person served with the complaint and defendant "started yelling at [him] and why [he] opened the door. Then [defendant] . . . took the papers . . . and threw them at [him]." Plaintiff told their son to leave the house.

When plaintiff finished work, she went directly to the Fort Lee Police Department to report the incident. Although plaintiff was fearful of defendant, she did not seek a TRO at the request of their son who was afraid defendant would go to jail. After she left the police station, she picked up their son and went home. Plaintiff stayed away from defendant but heard him talking in the basement and jumping on a portrait of the family. Plaintiff saw their son take the broken portrait to his room and hide it. Later, defendant told their son he was "going to kill himself in front of the garage, and [they] would have to clean the remain[s] and clean the blood."

On July 18, plaintiff returned home from work and began cleaning dishes in the kitchen. Defendant was in the basement and came up to the kitchen soon after plaintiff arrived home. "[H]e came up to [her] pretty close, so close that [she] was able to hear[] hi[m] breathing." Defendant was topless, wearing only underwear. He asked her to "stop the divorce" and told her "we[ are] going back to normal." Plaintiff responded that she "[was] not going to. This time [she] was going to the end" and stepped away with her back to him. "[W]hen [she] refused, he grabbed [her] hands so [they were] toward . . . him . . . ."

Plaintiff testified defendant "grabbed [her] . . . because [she] was running away from him." He grabbed her forearms from behind and pulled her arms

A-0374-23

back, "pulling [her] against him, . . . trying to . . . kind of hug himself with [her] hands." She told him not to touch her and said she was going to go to the police. Defendant responded that he did not care and was "going to meet [the police] in [his] underwear" and "tell [them] that [plaintiff] broke [his] hand." Plaintiff testified defendant's hand was "wrapped when he came toward [her]" but she did not know why.

Defendant told plaintiff she was "going to have it the hard way" and began to make vulgar gestures toward her, including manipulating his genitals. Defendant said "he was going to make [her] life miserable," "make [her] life a hell," and "he[ was] going to make a jail out of [her] house if [she was] not going to stop the divorce." Plaintiff testified she found his actions "threatening" and "frightening" because "[w]ho knows what to expect from the person who has a gun in the house."

Plaintiff went to the Fort Lee Police Department and requested a TRO. Before doing so, she texted with their son who responded "if [she was] ready, [she could] go and do it." Officers served the TRO on defendant and removed him from the home. They seized his firearms identification card, three rifles, a handgun, and ammunition, all of which were legally possessed. Plaintiff

testified there were nine "sabers" or "swords" in the home that were not seized and remain in the home.

On July 27, plaintiff received a call on her mobile phone from defendant's father in which he asked why defendant was out of the house and accused plaintiff of kicking him out. During the call, plaintiff heard someone other than defendant's father whispering. She heard the person say "he wants [her] to drop the TRO, and he would sign all the papers for divorce, and we[ are] not going to go to the [c]ourt. Just drop [the] TRO before we go to the [c]ourt." At the end of the call, she heard defendant "screaming" and "[h]e said [she is] stupid, and [he] did[ not] know what to do."

Plaintiff testified regarding several prior incidents. In January 2020, defendant and their son, who was twelve years old at the time, argued because he threw defendant's cigarettes and marijuana in the trash. Defendant "was[ not] happy about that" and "grabbed him and . . . said if you throw my stuff, I[ am] going to throw you out as well. And he put[] [their son] [in]to the garbage bin in the kitchen."

In 2012, plaintiff and defendant moved into an apartment in Cliffside Park. Soon after they moved in, plaintiff discovered a small camera in the bedroom she was sharing with her sister at the time. Plaintiff immediately called

5

defendant who admitted he installed the camera "to make sure that [plaintiff was] not . . . having sex with [her] sister." Defendant thought they "had a sexual relationship . . . because [they were] too close."

In April 2013, while plaintiff and defendant were still living in the Cliffside Park apartment, they had an argument about plaintiff's sister who was then ill and living with them. Plaintiff threatened to call the police and defendant "pushed [her] away" and went to their son's room to pretend he was asleep. Plaintiff reported the incident to police but did not seek a TRO.

Plaintiff requested an FRO because she did not "want to live with that anymore." She was "scared of" defendant because he is "unpredictable," and she was afraid for her wellbeing as well as their son's.

Defendant testified he could not have grabbed plaintiff on July 18, 2023, because his "arm was swollen and bandaged in gauze." He did not know what happened to his arm, only that it was a "medical problem, something based in [his] nerves." The problem started "the day of the incident . . . on [July 14], because [he] was under tremendous stress, and [he] had this (indiscernible) break." He went to the doctor sometime between July 14 and 18 and took "[w]hatever the doctor prescribe[d]" for him.

A-0374-23

He initially denied throwing the divorce papers at their son on July 14, contending he threw the papers "at the table, on the basement table," not at their son. Defendant later admitted their son was not lying when he said defendant threw the divorce papers at him. Defendant denied placing their son in the garbage can and denied any recollection of the underlying incident relating to his cigarettes and marijuana. He also denied installing the video camera in plaintiff's bedroom.

Defendant admitted he was with his father on July 27 when he "was guessing" his father called plaintiff. Defendant contended he "just talked to [his] father. . . . [He] did[ not] speak with the plaintiff directly." He told his father he would "sign the . . . divorce papers[] if [he was] allowed to stay home and live there. So that[ is] the only thing [he] . . . suggested. And [he] ask[ed] her not to argue." He "told [his] father what plan [he] ha[d] to repair . . . [the] relationship between [them] and stop the argument."

At the conclusion of the trial, the court entered the FRO supported by an oral opinion. The court found plaintiff's testimony credible based on "her demeanor" and because her testimony was "far more accurate," "detailed," and "reasonable." It determined defendant's testimony was less credible because he "showed episodes of anger," "was often evasive and would not answer

A-0374-23

questions," and "often reinterpreted questions . . . for purposes of his presentation. Ultimately, . . . plaintiff's testimony was far more believable . . . ."

Applying the two-step analysis set forth in <u>Silver v. Silver</u>, 387 N.J. Super. 112, 125 (App. Div. 2006), the court found defendant committed the predicate acts of harassment, N.J.S.A. 2C:33-4; assault, N.J.S.A. 2C:12-1; and contempt of a domestic violence order, N.J.S.A. 2C:29-9(b). The court found the predicate act of assault based on the incident on July 18, 2023, when defendant "grabbed . . . plaintiff, by the arms." It determined "defendant was upset with regard to a divorce complaint being filed. He confronted . . . plaintiff regarding dismissing the . . . divorce, and when she refused, he became upset."

The court found the predicate act of contempt based on the July 27, 2023 phone call to plaintiff because defendant was "speaking through his father to . . . plaintiff." At the time, defendant "knew there was a [TRO] in place" and "he could have no contact directly with . . . plaintiff as well as through third parties." The court found the predicate act of harassment for the same reasons as the predicate acts of assault and contempt.

The court determined an FRO was necessary to protect plaintiff against future acts of domestic violence based on the "long and varied" history of

A-0374-23

domestic violence and because "defendant's acts escalated to the point" where plaintiff is "in fear for her life, health[,] and safety." It found "there[ is] an immediate danger. Aside from the weapons, his acts of aggression and abuse are significant and have great depth." The court also noted "when the facts involve[] physical force and violence, [the] decision to enter [an FRO] is often perfunctory and self[-]evident."

On appeal, defendant contends the court erred by finding the predicate acts of assault, harassment, and contempt. Specifically, defendant argues he did not commit assault on July 18, 2023, because "he simply tried to have [plaintiff] hug him while he was clearly saying that he did not want a divorce" and she "suffered no injuries." He contends "the alleged harassment incidents" involved their son and other third parties, not plaintiff. Defendant argues he did not commit the predicate act of contempt because "there is no proof that he made any statements with intent to harass or annoy." The court erred by finding an FRO was necessary because "there was no credible explanation as to why [plaintiff] needed future protection." It also improperly allowed leading questions on direct examination and the TRO did not apprise defendant of the nature of plaintiff's claims.

A-0374-23

Our scope of review is limited when considering an FRO issued by the Family Part. See D.N. v. K.M., 429 N.J. Super. 592, 596 (App. Div. 2013). We "grant substantial deference to the trial court's findings of fact and the legal conclusions based upon those findings." Ibid. (citing Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12 (citing Rova Farms Resort, Inc. v. Inves. Ins. Co., 65 N.J. 474, 484 (1974)). Deference is particularly appropriate where the evidence is largely testimonial and hinges upon a court's ability to make assessments of credibility. Id. at 412. We review de novo the court's conclusions of law. S.D. v. M.J.R., 415 N.J. Super. 417, 430 (App. Div. 2010).

The entry of an FRO requires the trial court to make certain findings, pursuant to a two-step analysis. See Silver, 387 N.J. Super. at 125-27. "First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125 (citing N.J.S.A. 2C:25-29(a)). The trial court should make this determination "'in light of the previous history of violence between the parties.'" Ibid. (quoting Peranio v. Peranio, 280 N.J. Super. 47, 54 (App. Div. 1995)).

Second, the court must determine "whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6),[2] to protect the victim from an immediate danger or to prevent further abuse." Id. at 127 (citing N.J.S.A. 2C:25-29(b) (stating, "[i]n proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse")); see also J.D. v. M.D.F., 207 N.J. 458, 476 (2011). While the second prong inquiry "is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the [applicable] factors . . . to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127 (citing N.J.S.A. 2C:25-29(b)).

---

[2] The six factors are:

> (1) [t]he previous history of domestic violence between the plaintiff and defendant, including threats, harassment, and physical abuse; (2) [t]he existence of immediate danger to person or property; (3) [t]he financial circumstances of the plaintiff and defendant; (4) [t]he best interests of the victim and any child; (5) [i]n determining custody and parenting time the protection of the victim's safety; and (6) [t]he existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a)(1)-(6).]

A-0374-23

A person is guilty of assault if the person, "[a]ttempts to cause or purposely, knowingly[,] or recklessly causes bodily injury to another . . . ." N.J.S.A. 2C:12-1(a)(1). "'Bodily injury' is defined as 'physical pain, illness or any impairment of physical condition.'" State ex rel. S.B., 333 N.J. Super. 236, 242 (App. Div. 2000) (quoting N.J.S.A. 2C:11-1(a)). "'Not much is required to show bodily injury. For example, the stinging sensation caused by a slap is adequate to support an assault.'" State v. Stull, 403 N.J. Super. 501, 505 (App. Div. 2008) (quoting N.B. v. T.B., 297 N.J. Super. 35, 43 (App. Div. 1997)). "'Even the slightest physical contact, if done intentionally, is considered a simple assault under New Jersey law.'" N.B., 297 N.J. Super. at 43 (quoting State v. Bazin, 912 F. Supp. 106, 115 (D.N.J. 1995)).

A person commits harassment if, with purpose to harass another, the person:

> a.   Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b.   Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c.   Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

A-0374-23

[N.J.S.A. 2C:33-4(a)-(c).]

"[A]nnoyance or alarm" has been said to mean "'to disturb, irritate, or bother.'" J.D., 207 N.J. at 477 (quoting State v. Hoffman, 149 N.J. 564, 580 (1997)). "'A finding of a purpose to harass may be inferred from the evidence presented' and from common sense and experience . . . ." H.E.S. v. J.C.S., 175 N.J. 309, 327 (2003) (quoting Hoffman, 149 N.J. at 577). The "finding must be supported by some evidence that the actor's conscious object was to alarm or annoy; mere awareness that someone might be alarmed or annoyed is insufficient." J.D., 207 N.J. at 487.

A person is guilty of contempt if "that person purposely or knowingly violates . . . an order entered under the provisions of the [PDVA]." N.J.S.A. 2C:29-9(b).

Pursuant to these principles, we affirm substantially for the reasons set forth in the court's oral opinion. There is no basis to disturb the court's factual findings or legal conclusions. The court had the opportunity to hear and consider the testimony of the witnesses and assess their credibility. Its factual findings are supported by substantial, credible evidence, and those facts were correctly applied to the law.

A-0374-23

Defendant's contention that plaintiff did not prove a predicate act lacks merit. The court found, based on plaintiff's credible testimony, defendant committed assault on July 18, 2023, when he grabbed plaintiff's arms and pulled them behind her back to place them around his body. That finding is plainly sufficient to establish the predicate act of assault. The court found the predicate act of contempt based on plaintiff's credible testimony, as well as defendant's admission that he was present when his father was on the phone with plaintiff and attempted to communicate with plaintiff through his father. The court found harassment based on the same conduct that included offensive touching and communications made in a manner likely to cause annoyance or alarm and done with the purpose to harass plaintiff.

Defendant's argument that the court erred in determining an FRO is necessary to prevent future acts of domestic violence is not convincing. "When the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" A.M.C. v. P.B., 447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J. Super. at 127). After considering all the evidence presented regarding the incidents on July 14 and 18, 2023, in addition to the prior incidents in 2020, 2013, and 2012, the court found an FRO is necessary to prevent future

acts of domestic violence. "At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims." Hoffman, 149 N.J. at 584. The substantial, credible evidence in the record reflects that the entry of the FRO in this case achieved this goal.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0374-23